**EVANS, INC., Plaintiff,**

v.

**TIFFANY & CO., Defendant.**

**No. 73 C 2555.**

United States District Court, N. D. Illinois, E. D.

Jan. 29, 1976.

Supplemental Opinion April 14, 1976.

Lee N. Abrams of Mayer, Brown & Platt, Chicago, Ill., for plaintiff.

Rodney D. Joslin, Thomas P. Sullivan, William D. Heinz of Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER OF JANUARY 29, 1976.

McLAREN, District Judge.

### I.

#### Introduction

This matter arose as an action by Evans, Inc. (Evans) against Tiffany & Company

(Tiffany) for breach of contract.[1] The case was tried to the Court without a jury. The Court has examined all of the testimony and exhibits presented, and being fully advised of the premises, finds that a binding contract existed between Evans and Tiffany and that Tiffany breached the contract. Evans shall be entitled to damages in the amount of $598,924.00. The following shall constitute the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).

## II.

## Statement of Facts[2]

A. *Pre-January 29, 1973 Contacts*

Since 1966 Tiffany has maintained a retail branch jewelry store at 715 North Michigan Avenue. In mid-1972 Tiffany determined that the 715 North Michigan space (5,000 square feet) was beginning to be inadequate for its increased volume. It was also concerned that in 1976 when its lease expired it might not be able to renew its lease on the 715 North Michigan premises. Tiffany thus began a search for a new retail store location. It was quickly determined by Tiffany officials to remain on North Michigan Avenue, hopefully in a store in the approximately three-quarter mile strip between the Saks Fifth Avenue store on the south and the Drake Hotel on the north, the prime luxury shopping area along North Michigan Avenue. Tiffany desired a store of approximately 8,500 square feet, with substantial ground floor exposure, at a $100,000 annual rental.

During late 1972 Anthony Ostrom, Divisional Vice President for Tiffany in Chicago, considered various Michigan Avenue locations as possible new sites for Tiffany's Chicago retail branch. The only Michigan Avenue locations in which Ostrom was at all interested during that period (other than the 715 North Michigan Avenue location) were: (1) the Farwell Building at the northwest corner of Superior and Michigan (diagonally across Michigan Avenue from Tiffany's present location); (2) the proposed Water Tower Place Development; (3) the building at 549 North Michigan Avenue which previously was occupied by the Berman Fur Company; and (4) the building at 920 North Michigan Avenue.

Tiffany's interest in the Farwell Building was never thoroughly explored because Tiffany's executives did not think that the building was suited for a Tiffany store location. The 549 North Michigan Avenue building was rejected as being too far south in the trade area (this building being south of the Saks store).

By October 1972, the Tiffany executives were conducting their site search through Howard Storch of Brown & Storch. Storch is a well known Michigan Avenue real estate broker. Storch showed Ostrom the 920 North Michigan site. Evans, as successor in interest to Blum's-Vogue, Inc., is the lessee of the entire building at 920 North Michigan Avenue, under a lease which is to expire on May 31, 1989. The lessor of the building is a LaSalle National Bank land trust, the principal beneficiary of which is Jerrold Wexler.

In late October 1972, Tiffany's senior management became involved in the search for a new store location. Farnham Lefferts, President of Tiffany, visited Chicago to examine various buildings. Without informing Evans, Lefferts examined the first and second floors and the mezzanine of the building at 920 North Michigan Avenue with Storch and Wexler. Those three then had a luncheon meeting with Ostrom. Wexler stated that he thought that he could reacquire Evans' leasehold interest in the 920 North Michigan Avenue building. He said that he would then lease the first two floors and the mezzanine to Tiffany. He stated, however, that he would do so only if Tiffany agreed to a "demolition clause"

---

1. Jurisdiction is based upon diversity of citizenship and is not in dispute. 28 U.S.C. § 1332.

2. The Court hereby incorporates by reference the entire agreed statement of facts set forth in the amended Final Pretrial Order of March 31, 1975. As needed, certain portions of that statement will be repeated here in the narrative form.

which would permit Wexler to terminate Tiffany's lease on one year's notice if he decided to demolish the building in order to develop a larger structure on the same site.[3] Wexler later communicated to Tiffany a $165,000 annual rental figure for the first two floors and the mezzanine of the 920 North Michigan Avenue building.

After his trip to Chicago, Lefferts indicated a preference for the 920 North Michigan Avenue location. Lefferts and Ostrom agreed, however, that Tiffany would not enter into a lease which could be cancelled on one year's notice under a demolition clause. Walter Hoving, Chairman of the Board of Tiffany, when informed, likewise agreed. The rental price Wexler proposed was also unsatisfactory.

In November 1972, Storch arranged a luncheon meeting with Ostrom and David Meltzer, President of Evans. Meltzer indicated that the recently-acquired Blum's-Vogue business (a women's dress and fur shop at 920 North Michigan) had not been financially successful for Evans, and that Evans was seriously considering closing the Blum's-Vogue apparel operation, retaining only its fur salon, which was successful. Meltzer said that he was anxious to dispose of the financial burden imposed on Evans by its lease of the building at 920 North Michigan Avenue. He said that he would let Tiffany have either an assignment of Evans' lease of the entire building, or merely a sixteen year sublease of the first two floors and mezzanine—which Tiffany preferred.

Ostrom informed Meltzer at this meeting that it was very important for Tiffany to occupy the premises for the full term of any lease because of the amount that it would expend for leasehold improvements. Meltzer responded that he did not think that this would present a problem. No specific economic terms were discussed at the meeting.

Ostrom communicated the results of that meeting to Lefferts. On December 14, 1972, Charles Anderson (Tiffany's chief architect) carefully inspected the building at 920 North Michigan Avenue. Anderson concluded that the space could be remodeled for use as a Tiffany retail branch, and so advised Tiffany executives.

During early January 1973, Evans sent to Tiffany operating statements for the 920 building and a copy of Evans' lease of that building. Some time in January, Storch advised Ostrom that Evans would sublease the required space for an annual rental of $115,000. Tiffany executives, however, decided that it should only pay $100,000 per year for the space and then only on a sublease basis.

During the same time period, Evans and Uptown Federal Savings & Loan Association (Uptown) were discussing the possibility of Uptown's leasing some space in the subject premises. Uptown was under considerable time pressure, believing that it needed a firm commitment for space before the Federal Home Loan Bank Board would process its branching application on a priority basis. This application was due February 1, 1973. Uptown's interest in the 920 North Michigan building was genuine; the Court believes that had the Tiffany-Evans arrangement not been consummated, Uptown would have rented space in the subject premises at an annual rental possibly as high as in the $115,000–$125,000 range.

During the pre-January 29th period, Tiffany also rejected its only other site under consideration, the Water Tower Place.

On the morning of Monday, January 29, 1973, Lefferts and Anderson flew to Chicago. Ostrom picked them up at the airport, and the three of them went first to the building at 920 North Michigan Avenue, which they examined briefly. After lunch, Lefferts, Anderson and Ostrom met with the developers of Water Tower Place, who offered Tiffany space in that proposed building.[4]

---

3. Wexler lacked the contractual power to obtain a demolition clause. His lease with Evans and Evans' sublease prevented demolition by Evans or Wexler.

4. Water Tower Place has just become available for occupancy since the conclusion of trial.

The cost of space in Water Tower Place was approximately double the price Tiffany wished to pay ($20.00 per square foot). Tiffany also was opposed to the 6% sales override (as against a flat rental). Moreover, Water Tower Place could not give Tiffany ground floor exposure. Thus, at the time of the January 29, 1973 meeting, the only site Tiffany had under active consideration was the 920 North Michigan Building.

## B. *The January 29, 1973 Meeting and Its Immediate Aftermath*

After leaving the meeting with the Water Tower developers, Lefferts and Ostrom went to Storch's office and Anderson went to make another inspection of the building at 920 North Michigan Avenue. Lefferts and Ostrom met at Storch's office with Storch, Meltzer, Ralph Romberg (Vice President of Evans), Irving Karm (Meltzer's assistant), and Ernest Wish of Coopers & Lybrand (Evans' public accounting firm). Meltzer stated that he had another prospective subtenant, a savings and loan association, which was prepared to pay $125,000 in annual rent for the first, second and mezzanine floors. Meltzer explained that the savings and loan association had to obtain a commitment for a suitable location near Walton and North Michigan Avenue within a few days in order to fulfill requirements incident to its application to open a branch in that area. This fairly summarized the actual status of the Uptown negotiations on January 28th. Meltzer stated, however, that he would prefer to lease the space to Tiffany. The evidence also shows that Meltzer explained clearly that he wished to wrap up a firm commitment for the subject premise before he left on an extended foreign business trip two days later.

Tiffany, through Lefferts, responded that it only would participate in a sublease arrangement, and would be willing to pay only $100,000 per year rental. Tiffany never objected to Meltzer's pressure to enter a firm commitment that evening. Meltzer made a counteroffer of $107,500 per year, which Lefferts also rejected. The Evans representatives then left the room to confer

privately. Upon their return, Meltzer stated that Evans would accept an annual rental of $100,000 if Tiffany would:

1. operate and maintain the air conditioning equipment which served the first three floors of the building;

2. install a separate entrance, lobby, show windows and elevator providing access to the fur salon which Evans operates on the second floor of the adjacent building at 900 North Michigan;

3. pay its proportionate share of any increase in real estate taxes on the building;

4. maintain the sidewalks; and

5. insure the plate glass on the main floor.

After consulting with Anderson and inquiring about the state of the air conditioning, Lefferts indicated that he would be agreeable to the basic Evans proposal.

Additional negotiations then took place. A November 1, 1973 anticipated occupancy date was set in order to give Tiffany the benefit of the 1973 Christmas selling season. A ninety-day rent-free period was established and it was provided that by March 1, 1973 a formal sublease was to be executed. Evans also agreed to:

1. supply heat for Tiffany during normal business hours;

2. pay all general real estate taxes and assessments, insurance and building operation and maintenance expenses; and

3. maintain the two existing in-store passenger elevators.

Brief reference was made to Evans' top lease with the Wexler trust. Lefferts pointed out that Evans' lease provided that Evans had to obtain its lessor's consent to any sublease, and to any remodeling of the building. He inquired as to whether this consent could be obtained. Meltzer replied that Wexler was a friend of his, and that Evans' lease provided that the landlord could not unreasonably withhold consent, so he did not anticipate any problem in obtaining Wexler's consent. No mention was made at the meeting of the interests of

Great-West Life Assurance Company and of United of America Insurance Company in the property.

After these negotiations were concluded, Meltzer again stated that he needed a binding commitment from Tiffany. The parties concluded that Storch should dictate a document setting forth the agreement of the parties. He dictated a draft in the presence of the parties, and after the draft was typed, Meltzer, Lefferts and Ostrom made a few changes in it. Meltzer insisted on the inclusion of a signature block explicitly showing that Lefferts agreed to the proposal. The parties then asked Storch to have his secretary retype the document in final form, and she did so. After the final version of the document was typed, both Meltzer and Lefferts signed it.[5]

Lefferts made no request to change language in the letter agreement to indicate that the agreement was provisional or contingent on execution of the formal sublease. Instead, after the document was signed, Lefferts stated that he would not release the signed original until he had Hoving's approval. He left the signed original with Ostrom, and stated that Ostrom would hold that document until he received instructions from Lefferts regarding its release. Meltzer expressed surprise at this procedure but acquiesced in it. Lefferts assured Meltzer that a deal had been concluded and that Hoving's approval was merely a corporate formality. Lefferts then left Storch's office and returned directly to New York that evening.

Subsequently, Hoving did approve the letter agreement and Ostrom released the document to Tiffany. Anderson immediately began preparing architectural drawings and plans for the Michigan Avenue entrance, lobby, elevator and two show windows that were discussed at the January 29, 1973 meeting.

On January 30, 1973, Anderson advised Lefferts that the presence of a structural steel pillar north of the Michigan Avenue entrance made it impossible to install two show windows there. Lefferts promptly telephoned this information to Ostrom, who in turn reported it to Meltzer by telephone on January 30, 1973. Meltzer agreed to accept one show window instead of two, and Ostrom advised Lefferts of Meltzer's agreement on that point. This revision was memorialized when Lefferts wrote Meltzer a letter dated January 30, 1973, which stated in part as follows:

"As stated to you today by Mr. Ostrom on the telephone in reference to Item No. 3 of the letter of intent between ourselves dated 1/29/73, we do not feel that the construction of two show windows for your use on the exterior of the building adjacent to your entrance is feasible nor that it would be desirable from an aesthetic standpoint due to the presence of a steel pillar to the north of the proposed entrance where such a window might logically be placed. We agree, therefore, to provide only one such window which will be to the south of the entrance. We shall endeavor to provide sufficient depth to accommodate two mannequins and any plan will, of course, be submitted to you for approval."

Each side then issued press releases concerning the agreement.

On February 2, 1973 Evans issued a press release announcing

"an agreement in principle to sublease the first two floors of the Blum's-Vogue premises at 920 North Michigan Avenue to Tiffany & Co., term of the sublease to run until May 31, 1989. The Blum's-Vogue fur salon will continue to be operated in completely refurnished quarters in the adjacent building at 900 North Michigan Avenue in Chicago."

On February 5, 1973 Tiffany issued a press release stating:

"In an agreement announced today by Mr. Walter Hoving, Chairman, Tiffany & Co. will lease the first two floors of the building at 920 North Michigan Avenue, Chicago, presently occupied by Blum's Vogue who will continue to operate in

---

5. See Appendix A for the full text of the January 29th agreement.

their refurbished store in the adjoining building.

" 'In the nearly seven years we have been there both the Avenue and our business have grown tremendously and we are bursting at the seams,' Mr. Hoving stated. 'Our new store will be almost doubled in size. We shall have two selling floors and the Jewelry Department will be greatly expanded. North Michigan Avenue is the finest retailing area in the Mid-west and we see a great future there for many years to come.'

"The opening is planned for this fall in time for the Christmas season."

Immediately after the January 29th meeting, Meltzer broke off negotiations with Uptown Federal, explaining that the subject premises had been leased to another tenant. Shortly thereafter, Evans terminated its Blum's-Vogue apparel operation at the 920 North Michigan site so that Tiffany's remodeling efforts could promptly begin. It also informed its customers, by letter, that Tiffany would occupy the 920 North Michigan site and that the Blum's-Vogue fur salon would occupy new, adjacent space in the 900 North Michigan Building.

During the spring and early summer of 1973 Anderson, the previously mentioned Tiffany architect, devoted most of his time to working on plans and drawings for the new Tiffany store. Anderson described that project as the most important one on which he was then working. After January 29, 1973, Anderson made thirteen trips to Chicago, and spent 23 days there, working on remodeling of the space at 920 North Michigan Avenue.

Early in February 1973, Anderson requested Inland-Robbins Construction Company to obtain a quotation on a custommade passenger elevator, which Tiffany was to install in the building at 920 North Michigan Avenue. On February 14, 1973, Gallaher & Speck sent to Inland-Robbins an estimate to furnish and install such an elevator for $16,800. Inland-Robbins transmitted that estimate to Anderson, and he directed Blake of Inland-Robbins to order that elevator for Tiffany. Blake ordered the elevator from Theobold of Gallaher & Speck, and directed Theobold to have the components of the elevator delivered to the building at 920 North Michigan as soon as they were ready. Some of those components were delivered to the building at 920 North Michigan on or about May 1, 1973.

During that same period, Anderson also prepared extensive architectural drawings and plans for remodeling that space, and for installation of the new entrance, lobby, elevator and show window for the 920 building.

### C. Negotiations Regarding Execution of a Formal Sublease

Negotiations regarding execution of a formal sublease began in late February 1973 and ended without execution of a formal sublease in July 1973. The factual analysis of these negotiations will be two-part. First, the Court will summarize the chronology of relevant events. Secondly, the major points of controversy between the parties will be discussed.

### 1. Chronological Summary

On February 27, 1973, Evans' attorneys sent a draft of a formal sublease to Tiffany.

This draft consisted of a three-page printed form of store lease and a fifteen-page typewritten rider. During the next several weeks, Tiffany and its attorneys reviewed that sublease draft in New York. On March 28, 1973, Gerald Dunworth (Tiffany's New York attorney) discussed that sublease draft with Stanley Block (Evans' Chicago attorney) in a long-distance telephone conversation. Messrs. Block and Dunworth discussed the sublease draft during another telephone conversation on the following day, and at that time they agreed that Messrs. Meltzer and Lefferts and their attorneys should meet in person to work on the formal sublease. At this time the parties agreed to extend the target date for signing a formal lease to April 16, 1973.

On April 6, 1973 Lefferts retained local counsel to represent Tiffany in the instant transaction. Initially, John Purdy repre-

sented Tiffany as local counsel; later his senior partner, Malcolm Mecartney, became involved in the negotiations. On April 10, 1973, the parties met in an all-day meeting to discuss Block's first draft of the sublease. Purdy acted as counsel for Tiffany during this meeting. The parties and their counsel went through Block's first draft paragraph by paragraph. It is clear that during this meeting the parties negotiated in good faith toward reaching a formal sublease; at this point few issues remained in dispute. Specifically, the parties were in basic agreement on a use clause, emergency elevator access, the question of signs on the Walton side of the subject premises, and use of insurance proceeds if the building became damaged. At this point the parties also were in close accord with respect to the guarantees of performance that Evans would provide Tiffany, although specific language needed to be drafted on this point. The meeting adjourned with Mr. Block's being instructed to prepare another draft of the sublease.

Block submitted his second draft to Purdy on April 17th. Subsequently, Block and Purdy discussed this draft by telephone on April 20th. During this conversation problems concerning air-conditioning and elevator access particularly as these issues involved Brady C'est Bon, another Evans tenant in the subject premises, were discussed. The rent abatement and Evans' emerging elevator access issues were also mentioned, as were several other more minor problems. Again, as with the April 10th meeting, Purdy and Block actually negotiated about these terms. It appears to the Court that after this conversation no fundamental differences on the terms of the sublease were present although some dispute still existed

about the type of performance guarantees Evans would provide Tiffany.

Attorneys representing the parties next met on April 23d. Mecartney and Purdy met with Block in Block's office. From this point movement toward execution of the formal sublease essentially ceased. Before this meeting Mecartney had discovered that the Wexler interests held the 920 North Michigan building under a leaseback arrangement with certain insurance companies; the Evans lease (the top lease), however, apparently had priority over the Wexler leaseback agreement. Despite this fact,[6] Mecartney felt that Tiffany now needed additional protection so that its sublease would remain in full force for the full term. It was thus suggested that Tiffany might prefer a complete assignment of the Evans top lease.[7]

Further meetings including principals and counsel were held on April 25–26 to discuss the assignment possibility and the other remaining issues. While the parties discussed many subjects at these meetings, the result of these conversations can be summarized as, at best, inconclusive. Tiffany suggests that it notified Evans during these meetings that it did not feel contractually bound by the January 29th letter agreement. The Court has carefully examined the evidence on this point and believes that such a statement was not made; had such an important discussion occurred, it would have been reflected in various notes taken at these meetings. Moreover, the testimony presented by Purdy and Mecartney on this point seems internally inconsistent.[8]

Substantively, an attempt was made during the April 25–26 meetings to structure

6. Because the top lease had priority over the Wexler-insurance company lease-back transaction, the lease-back transaction should not have changed the Tiffany-Evans relationship. Tiffany still only had to look to Evans for performance so that its sublease would remain in effect.

7. Tiffany not only needed protection for the full term for normal business reasons such as protection of good will and protection against business interruption, but also it contemplated sub-

stantial remodeling expenses which would only be economically feasible if used by Tiffany for the full term.

8. Purdy testified that Mecartney claimed that the letter agreement was not a binding contract at the end of the April 26 meeting. Mecartney testified that he made such a statement at the beginning of the meeting before Purdy entered the room.

an assignment transaction which would be the economic equivalent of the sublease transaction. Mecartney also informed Evans during the April 26th meeting that Tiffany was concerned that the subject premises were in substantial violation of the building code which might delay remodeling. Evans' president, Meltzer, responded that the building was actually in substantial compliance with the building code. This response was factually correct. Moreover, considering the age of the subject premises, the building was in good condition throughout the time period in question.

Subsequently, on May 17 Lefferts advised Meltzer in a long-distance telephone conversation that Tiffany had decided that it was not interested in the proposed assignment transaction and that it wished to resume negotiations with respect to a sublease. All subsequent discussions between the parties related to achieving a formal sublease.

After May 17th, the negotiations between the parties began to disintegrate. Many of the issues settled in early April were re-opened at Mecartney's insistence. Tiffany also escalated its demands on unsettled issues during the post-May 17th period. After May 17th Tiffany demanded attornment and non-disturbance agreements from the Wexler interests, the underlying property owners. An attornment agreement would require Tiffany, the sublessee, to pay its rent to the Wexler interests, the top lessor, in the event of default by Evans, the top lessee. In turn, the non-disturbance agreement would require the top lessor, his mortgagee and the ground owner to honor Tiffany's right to possession in the event that Evans defaulted on the top lease so long as Tiffany would pay its rent to the Wexler interests and otherwise comply with the terms of the sublease.

Throughout the attempts to draft a formal sublease, dealing with Wexler proved to be a difficult task. The Evans-Wexler top lease provided that Wexler could not unreasonably withhold his consent to the sublease. It can be inferred, however, that Wexler saw the Evans-Tiffany transaction as an opportunity to make a windfall profit; apparently Wexler wished to extort a payment from the parties for his approval of the transaction. Ultimately, it appears that Wexler would have acquiesced to the transaction, and although it is uncertain whether the attornment and non-disturbance agreements would have been signed in a form completely agreeable to Tiffany. The parties also explored the possibility of obtaining title insurance to protect Tiffany in the event of an Evans default on the top lease. Title insurance was dependent on the execution of attornment and non-disturbance agreements.

On June 15, 1973 Meltzer and Romberg conferred with Hoving and Lefferts in Tiffany's New York office. At that meeting the Tiffany representatives told the Evans representatives that Tiffany's attorneys were preparing a new draft of the formal sublease and would submit that new draft of the sublease to Evans' attorneys within a relatively short period of time.

At this meeting Hoving insisted on attornment and non-disturbance agreements. Apparently Hoving believed, incorrectly, that the transaction could be subject to a demolition clause. Further discussions were held regarding the condition of the subject premises. In an attempt to compromise, the Evans principals agreed to include attornment and non-disturbance agreements in the formal sublease as well as title insurance, if it were possible to get such agreements and insurance (which would be paid at Evans' expense). Evans also agreed to correct any building code violations if they affected Tiffany's remodeling plans.[9]

---

**9.** Tiffany has also moved to amend its answer pursuant to F.R.Civ.P. 15(b) to state a new affirmative defense that the June 15th agreements contractually modified the January 29th agreement and that Evans could not fulfill these new promises. The motion will be denied since evidence relating to this issue was introduced solely to demonstrate the reasonableness of the parties negotiating tactics. Thus there was no implied consent to try this issue. Moreover, the new issue was not squarely faced so that Evans was not provided a fair opportunity to take discovery and present evidence to meet the legal argument. The Court

After the June 15th meeting, Mecartney prepared yet another sublease draft. Several meetings or phone conversations were then held discussing the draft but by the July 9th meeting, Mecartney reported to Block regarding issues still in dispute that Tiffany did not contemplate making any further changes of importance. Thereafter, on July 19th, Tiffany terminated the negotiations. Subsequently, Evans attempted to revive the negotiations with new attorneys participating. Tiffany refused, and this action followed.

### 2. Disputed Sublease Terms and Negotiating Tactics

When Tiffany broke off negotiations, it asserts that eight issues remained in dispute. Since these issues were the major points of controversy between the parties along with the attornment and non-disturbance agreement issue, the Court will examine nine problem areas in more detail.

### A. Termination Upon Major Damage

The early sublease drafts by Block provided that if major damage occurred to the subject premises, Evans would have the sole right to terminate the sublease. Tiffany objected to this term in the April 10th meeting, requesting mutual termination rights. Block replied that his draft clause was customarily included in subleases in the Chicago area. The issue was then dropped. Block included his version of the destruction clause in the second draft without objection from Tiffany representatives. Then late in the negotiations, Tiffany revived the issue. Mecartney's late June draft reversed the Block draft by allowing Tiffany a unilateral option to terminate. In an effort to genuinely compromise, Evans then abandoned its position, which was the customary

also believes, as will be shown below, that the factual premise Tiffany asserts is faulty. Ultimately Wexler would have agreed to the attornment agreements.

10. The tenant is also sometimes given the unilateral option where the property leased is a single-purpose, single-occupant building. The subject premises contains several subtenants and is not a single-purpose building.

trade usage, and suggested a revival of the mutual termination provision originally suggested by Tiffany. Mecartney rejected the compromise. (Ultimately, after Tiffany broke off negotiations, Evans acceded to the demand in an effort to revive attempts at reaching a formal sublease.)

Expert testimony demonstrates that Tiffany's final position on this issue was not only unusual but unreasonable. As noted, the customary trade usage gives the landlord the right ·to unilaterally terminate in the event of major damage. In some cases where the tenant has extraordinarily great bargaining power, the option is reversed.[10] In fact, Mecartney admitted that he modeled Tiffany's proposed termination provision on a clause in a one-sided lease which had been forced on the landlord by a tenant with unusual bargaining power. The instant case does not present such circumstances; here, as will be shown below, Tiffany was obligated to bargain reasonably and in good faith toward reaching a formal sublease document.

Moreover, the business justifications Tiffany presents for its position do not support its unusual position. It is inconsistent with Tiffany's expressed concern with staying on the site for the full term of the sublease. To protect this legitimate interest, a provision which obligated Evans to rebuild and obligated Tiffany to remain for the full term was sufficient.[11]

### B. Time for Evans to Meet Contingencies

Mecartney's June sublease draft injected into the negotiations a new issue as to when the formal sublease would take effect. The June draft provided that the sublease would take effect on August 1, 1973 (rent there-

11. Tiffany claims that Evans and the Wexler interests intended to redevelop the premises if major destruction occurred. This factual assumption is not supported by the record. Wexler testified that such a possibility was remote, other long-term subleases prevented such a program, and in any event, Evans had an obligation to rebuild.

fore would not be due until November 1, 1973 pursuant to the 90-day rent concession clause), and that all contingencies had to be satisfied by August 1, 1973. The transaction would automatically terminate at that date if (1) the Wexler interests failed to execute the attornment and non-disturbance agreements; (2) the necessary sublease consents were not executed, and (3) if title insurance was not obtained. At the July 9th meeting, Block properly noted that this provision was unrealistic since Evans would need Tiffany's completed remodeling plans before the Wexler interests signed any agreement or consent. Evans had yet to receive the plans. Block therefore suggested that the sublease should give Tiffany a reasonable time to complete its plans and that Evans then fulfill the required contingencies within 30 days. If unable to do so, a further 30 day grace period would be provided. Mecartney basically rejected this solution, believing that it would cause running of the rent-abatement period during the period when the transaction was still subject to contingencies. In fact, it is clear that Evans through Block had suggested that the rent-abatement period only start to run when all contingencies had been fulfilled. This unresolved issue therefore was based wholly on Mecartney's misunderstanding, not on any basic dispute between the parties.

### C. Use Clause

The January 29th letter agreement required that Tiffany remodel the subject premises for its own use. Block's first sublease draft defined this use as "the retail sale of fine jewelry and related items and services, and for no other purposes." In turn, Tiffany suggested a use clause copied from its other store leases. Use would be permitted for "the storage, display and retail of fine jewelry, silverware, glassware, china, stationery and related items and services sold by Lessee [Tiffany] in its New York and other stores." This change was accepted by Evans and incorporated in Block's second sublease draft.

Mecartney thereafter, in his June sublease draft, reopened the issue. This draft expanded the use definition to include "other retail merchandising use and purposes," except furs. Mecartney claimed that this new language was necessary so that Tiffany could transfer its leasehold interest, if its new operation were unsuccessful. Not only is this position inconsistent with Tiffany's claim that it needed extraordinary protection because it wished to stay for the full term, but it ignores Evan's legitimate interests in protecting its operations and operation of its other sublessees. Moreover, it is clear that Tiffany could have been adequately protected by a more limited, reasonable consent to sublease clause which Evans was willing to enter. In any event, Tiffany has utterly failed to explain its abrupt change of position on this issue and should have been bound by the reasonable language it proposed.

### D. Business Interruption Insurance

Block's two early sublease drafts provided that proceeds of business interruption insurance would be paid to an insurance trustee who would then pay Tiffany's rent, as due, to Evans. This procedure is customarily used in commercial sublease transactions regardless of the financial strengths of the parties. Moreover, during the April negotiating sessions, Tiffany representatives made no objection to this standard practice.

Again, Mecartney's June sublease draft raised a new issue with respect to payment of business interruption insurance. This draft provided that proceeds of such insurance should be paid to Tiffany, who in turn would pay the rent. Tiffany's only justification for this new position was that Block's provision was "offensive" considering Tiffany's financial strength. This argument illustrates Tiffany's negotiating stance after the April meeting. Tiffany, rather than follow customary trade usage, began haughtily to demand unusual lease terms, protesting that its integrity and Evans' "untrustworthiness" required a one-sided transaction in its favor. Tiffany has failed to prove that it reasonably believed

Evans was untrustworthy. Rather, its position on this issue ignored Evans' reasonable requests as a landlord and evidences an unreasonable negotiating style representing an arbitrary determination by Hoving and Lefferts that they did not desire to be associated with Evans as a landlord for a lengthy period of time as contemplated by the projected sublease.

### E. Rent Acceleration

Block's February sublease draft provided that in the event of a Tiffany default, Evans would have the option to terminate the sublease and then it would be entitled to recover from Tiffany the full rent for the period from the time of default to the end of the sublease. Such clauses are customarily included in commercial leases, although Illinois law now apparently imposes a duty to mitigate damages on lessors whose tenants have breached. Neither Block nor Mecartney were aware of this change in the law.

Tiffany, however, throughout the negotiations demanded a rent-acceleration clause similar to the standards actually imposed by Illinois law. In this limited area, Tiffany's position therefore was more reasonable than Evans'. Evans' position, however, did not justify Tiffany's negotiation termination. Tiffany's position is an implied term in all Illinois leases so that Tiffany would be fully protected even if the Block term were included. Moreover, considering Tiffany's professed desire to remain for the full term, a Tiffany default was a remote contingency. Therefore terminating the whole transaction over this one issue, considering Evans overall reasonable stance, would have been unjustified.

### F. Signs

In May 1973, Meltzer and Lefferts agreed that Evans' other subtenants could place appropriate signs on the canopy on the Walton Street side of the subject premises. This solution was reasonable because Tiffany had no intention of using the Walton side of the building as an entrance; Tiffany's entrances would be exclusively on Michigan Avenue and thus the Walton entrance would not be directly associated with the Tiffany operation. Additionally, Tiffany was aware that Evans was obligated under its sublease with Brady C'est Bon to allow Brady to place signs on the Walton side canopy.

Mecartney's June sublease draft altered the Lefferts-Meltzer agreement with respect to signs reached in April. Rather than have a provision which stated that the parties would not unreasonably withhold consent to a sign proposal, Mecartney's draft provided that each party would have absolute veto power. Under this provision, a sign proposal could be rejected unreasonably and arbitrarily. This type of clause was unnecessary to protect Tiffany's legitimate interest in protecting its image and again ignored Evans' reasonable interests as a landlord. Tiffany also again has failed to adequately explain its change of position from a less stringent to a more rigorous term. The Court therefore concludes that Tiffany acted unreasonably with respect to the sign issue.

### G. Air Conditioning

The January 29th letter agreement expressly provided that Tiffany would operate and maintain certain air conditioning facilities in the subject premises. Tiffany was aware at that time that the unit in question also served the Brady C'est Bon third floor premises. Tiffany did not know, however, that Brady had a contractual right to use one-half of the capacity of the relevant air conditioning, if necessary, even though its proportion of subject premises cooled by the unit in question was substantially smaller. At the January 29th meeting, Evans also stated that the noted engineering firm, Kroeschell, inspected and maintained the equipment monthly and that no problems were evident. At the April 10th meeting, Tiffany agreed to accepting the air conditioning equipment in its then present condition.

During the subsequent negotiations, Tiffany became concerned that the present unit was inadequate to cool the first three

floors of the subject premises. To resolve this fear, Meltzer suggested, and Lefferts accepted, the proposal that Evans would install any additional air conditioning equipment Kroeschell determined was needed. Tiffany then would pay, consistent with the January letter agreement, the operating and maintenance costs of such new equipment.

Mecartney's June sublease draft dramatically altered the Meltzer-Lefferts agreement. This draft proposed that Tiffany be given exclusive use of the existing unit and that Evans provide and operate, at its sole expense, a wholly new unit for the Brady premises. Mecartney was then informed by both Evans and Tiffany representatives of the Meltzer-Lefferts agreement, and in the July 9th meeting, Block offered expressly to include in the formal sublease a provision requiring Evans to add whatever new equipment Kroeschell recommended. Inexplicably, Mecartney still refused to modify his clause to reflect the agreement of the parties. Undoubtedly, the July 9th Block proposal adequately stated the agreement between the Evans and Tiffany principals and adequately protected Tiffany's interests. To rely on this issue as a cause for termination is therefore clearly unreasonable.[12]

## H. *Emergency Elevator Access Rights*

The January 29th letter agreement provided that Tiffany would construct a separate Michigan Avenue entrance and elevator for Evans' Blum's-Vogue operation. This would provide an independent Michigan Avenue identity for Blum's. The January agreement also provided that Evans would maintain the in-store elevators for the Tiffany operation. No statement concerning the use of these elevators was included in the letter agreement.

In April, Lefferts requested exclusive use of the in-store elevators to protect Tiffany's understandably rigorous security interests.

Meltzer agreed to the exclusive use in return for Tiffany's additional promises to maintain these elevators and allowing Blum's customers to use the Tiffany elevators if the newly constructed elevator (the only access to the Blum's store) broke down. Subsequently, the parties agreed that the Blum's emergency access right would be limited to normal business hours.

Thereafter a dispute developed about emergency elevator access if Evans changed its use or sublet the Blum's space. Mecartney's June sublease draft provided that the emergency access would automatically terminate in the event of change of use or sublease. Meltzer informed Lefferts that this new term was unduly burdensome to Evans and violated the spirit of their prior agreements with respect to elevator access. Lefferts agreed and stated that the Mecartney draft did not accurately reflect Tiffany's position. Mecartney then authored a new draft which provided that if Evans transferred the Blum's space to a third party, Tiffany would not unreasonably withhold its consent to transfer the emergency access rights. This new draft clause, however, was silent as to what would occur if Evans itself changed the use.

To solve this remaining technical, minor point, Block suggested that Evans be granted the same "reasonable consent" clause as a potential new occupant would be provided. Mecartney refused, stating that Tiffany should have "sole discretion" to withhold access if Evans changed its use. Tiffany has failed to explain why Evans should have been treated more harshly than an unidentified third party. The Court agrees with Tiffany that it had legitimate interests in controlling traffic through its store to protect security and its image as a quality merchandiser. Tiffany cannot, however, justify why the reasonable consent clause it drafted for third parties was not equally adequate for dealing with Evans in a

12. It should also be noted that the air-conditioning equipment in question is presently still in use and adequately cools the first three floors of the subject premises even though the present ground floor tenant has built several

new floor-to-ceiling display windows significantly increasing the heat load. Tiffany's fears with respect to the Brady contract and the capacity of the equipment appear to be misplaced.

changed-use context. Its position on this issue was therefore irrational and unreasonable.

### I. Protecting Tiffany's Occupancy for the Full Term

A crucial issue throughout the negotiations was the type of protection Tiffany would receive against early termination of its leasehold interest. Block's first draft provided that Tiffany would be paid for its unamortized leasehold improvements if the top lease were terminated and it were unable to continue possession under substantially similar terms. This clause did not allow Evans and Wexler to terminate the top lease by consent but was directed at the problem of default under the top lease. Assuming that Evans did not default under the top lease and that Tiffany did not default under the sublease, Tiffany's possession would be guaranteed (an implied covenant of quiet enjoyment).

Tiffany felt insufficiently protected by Block's first draft; thus Block's second draft (the April sublease draft) included a clause which stated that Evans would use its best efforts to guarantee that the top lease would remain in effect. Such a clause goes considerably beyond the normal implied covenant of quiet enjoyment in that it provides for best efforts rather than reasonable efforts on the part of the sublessor. Subsequently Evans also promised to pay damages if it failed to use its best efforts and also promised to reimburse Tiffany for the unamortized value of its leasehold improvements if Tiffany's possession were disturbed despite Evans' compliance with the best efforts clause.

Even though Evans was willing to give Tiffany more protection than normally provided in subleases and was so financially strong that its default under the top lease was a remote contingency, Tiffany demanded additional protection. Tiffany desired the attornment and non-disturbance agreements previously described. Evans was willing to present such agreements to Wexler for his approval and, as previously noted, Wexler eventually appeared prepared to approve such agreements. Tiffany, however, terminated the negotiations before such agreements could be finalized.

The Court believes that Evans negotiated in good faith in an attempt to meet Tiffany's fears about guaranteed possession (fears which seem excessive in light of all the surrounding circumstances). Tiffany's demands on this point increased throughout the course of negotiations and Evans met these and attempted to provide additional guarantees as requested. Ultimately, even though Tiffany had only a slight business justification for the attornment agreements (agreements which were not required by the January 29th letter agreement), such agreements were going to be provided. Tiffany's precipitous termination prevented resolution of the issue.

## III.

## CONCLUSIONS OF LAW

### A. The January 29th Letter Agreement Is a Contract

 This Court's prior opinion denying defendant's motion to dismiss establishes the law of the case with respect to the question of whether the January 29th letter agreement is a contract. Under Illinois law the question of whether a binding contract exists is determined by the intent of the parties when the document in question is executed. *Borg-Warner Corp. v. Anchor Coupling Co.*, 16 Ill.2d 234, 156 N.E.2d 513 (1956); *Welsh v. Jakstas*, 401 Ill. 288, 82 N.E.2d 53 (1948). In measuring intent, all relevant circumstances surrounding negotiation and execution of the January 29th letter agreement should be considered as well as the language and terms of the agreement itself. Moreover, the contemplation of the execution of a formal agreement in the future does not render prior agreements mere negotiations where the parties intend that the formal agreement will be substantially based upon the earlier agreement. *Borg-Warner v. Anchor Coupling, supra* ; *Horton & Co. v. Cook Elec. Co.*, 356 F.2d 485 (7th Cir. 1966). Of course, for the initial agreement to be considered

binding rather than mere negotiations, the initial agreement must include clauses setting forth all the essential elements of the transaction in question.

■ The January 29th letter agreement includes all the essential elements of a commercial sublease transaction, the premises and terms are defined and the cost of rental is set forth. Additionally, such matters as maintenance costs, remodeling costs and taxes are dealt with in the document. The document also includes a signature block which explicitly shows Tiffany's acceptance of the agreement. Moreover, the language of the letter reflects a positive intent to be bound—the letter starts with the phrase "[t]he purpose of this letter is to cover your [Tiffany's] intent to lease" (meaning present intent) and the operative clauses affirmatively state that the sublessee "shall" perform the obligations of the sublease.

The surrounding circumstances also indicate that the parties intended to be contractually bound. Evans was under considerable self-imposed pressure to consummate a firm and binding arrangement and so stated to Tiffany before and during the January 29th meeting. On January 29th Tiffany also was ready to seriously consider a binding commitment. Tiffany had made an extensive search for new premises and the 920 North Michigan building was under active, prime consideration for several months prior to the meeting in question.

Other indicia that the letter agreement was intended to be binding include Tiffany's insistence that corporate formalities be followed in consummating the transaction. Lefferts refused to release the signed original of the letter until Tiffany's chairman, Hoving, approved the document. Tiffany's press release announcing the transaction also indicates that a binding contract existed as does Evans' termination of negotiations with Uptown. Anderson's preparation of remodeling plans also shows a similar intent.

Custom and usage in the real estate business also tend to indicate that the January 29th letter agreement was intended to be binding. If the letter was intended to describe the state of non-binding preliminary negotiations, it would customarily contain an express disclaimer stating that the parties do not intend to be bound until a more formal document is completed and executed. Since the document here has no such clause, it appears that the parties intended that the letter have substantive legal effect.

In sum, the Court believes, looking at the activities of the parties before, during, and after the January 29th meeting, and the language of the agreement, that the letter agreement was intended to be binding.

The Court also finds that Evans did not fraudulently induce Tiffany's agreement to the January 29th agreement. Moreover, the fact that a formal sublease was not executed by the target date specified in the January 29th letter agreement is of no legal consequence. This date was only meant to be a target not a controlling condition subsequent to a binding agreement. Throughout the negotiations the parties ignored the date, effectively waiving its significance, if such significance were originally intended.

B. *Tiffany Breached Its Obligation Under the January 29th Letter Agreement*

■ The January 29th letter agreement provides that the parties intended "to enter into formal lease contracts embodying the above terms and conditions within reasonable limitations. . . ." This "reasonable limitations" clause imposed upon the parties an obligation to negotiate in good faith and to make a *bona fide* effort to reach agreement on disputed sublease terms. *Borg-Warner v. Anchor Coupling, supra.*

■ The parameters of good faith negotiation must be derived from Illinois common law general contract law. Although not directly on point, in the absence of other, more direct authority, the Court will look to definitions contained in the Uniform Commercial Code for some guidance. The Code defines good faith as honesty in fact in the conduct of the transaction concerned

and requires observance of reasonable commercial standards of fair dealing in the trade. U.C.C. §§ 1–201(19), 2–103(1)(b). Comments to the Code also suggest that even where the contract gives one party a right to specify an open term, that party is not permitted to include a provision which could not be reasonably anticipated. U.C.C. § 2–311, comment 1.

◼ Applying these principles to the instant facts, the Court believes that the January 29th letter agreement obligated the parties to negotiate reasonably and fairly giving due deference to the legitimate business needs of the other party. The parties were obligated not to insist on arbitrary clauses and were supposed to be bound by reasonable custom and usage in the real estate trade. Here Tiffany breached its obligation to negotiate in good faith by ignoring custom and usage, insisting on arbitrary clauses, and ignoring Evans' legitimate interests as a landlord. Moreover, as shown above, Tiffany's legitimate business needs could have been protected by considerably more moderate alternative clauses. Tiffany also breached by backing off from agreements made earlier in the negotiations; it escalated its demands on numerous issues as the negotiations progressed. In contrast, Evans approached the negotiations fairly and demonstrated a sincere desire to conclude an agreement on mutually satisfactory terms. It compromised on many issues and acceded to several of Tiffany's unusual, non-customary requests.

Tiffany attempts to justify its negotiating tactics by claiming that it needed unusual protection because it legitimately lost faith in Evans' business ethics and ability to perform. In fact, the Court believes, as previously noted, that Tiffany's behavior, rather than representing reasonable business considerations, evinces an arbitrary determination by Hoving and Lefferts that they did not want to be associated with Evans in a complicated business relationship. Evans' strong financial position and good faith negotiating tactics did not require Tiffany to take unusual precautions and in any event many of Tiffany's posi-

tions provided considerably more protection than required even if Evans was untrustworthy. The Court therefore holds that Tiffany breached the January 29th contract by refusing to sublease the subject premises and by refusing to negotiate in good faith.

C. *Damages*

◼ Evans is entitled to damages necessary to place it in the same position as it would have been if Tiffany had performed under the January 29th contract. Undoubtedly, Evans is entitled, under this rule, to damages for lost rental revenue for the period the premises remained vacant due to Tiffany's failure to rent the premises.

Had Tiffany negotiated in good faith it would have signed the formal sublease by July 1, 1973. Under the 90-day rent abatement provision, Tiffany's obligation to pay rent would have commenced October 1, 1973. Scandinavian Design began paying rent on the premises on March 1, 1975. Thus the premises were vacant for seventeen months and at the stipulated rental of $8,333 per month, Evans would have received $141,667. This sum must be reduced by $12,600 because Evans used certain show windows which would have been used by Tiffany. Evans therefore lost $129,067 for the period prior to March 1, 1975. Evans is entitled to fully recover this sum because it diligently attempted to rent the premises and because there is no evidence in the record that Scandinavian Design or any other putative tenant was genuinely willing to pay rent before that date. Evans' use of certain other space in the subject premises during the pre-March 1, 1975 period should not serve to further reduce its recovery since this clearly was a stop-gap measure solely occasioned by Tiffany's breach.

◼ Evans is also entitled to recover damages for the difference between the rent Tiffany would have paid and the rent Evans will receive from Scandinavian Design. Tiffany was required under the January 29th contract to rent 9,321 square feet at $100,000 per year. Scandinavian Design is obligated to pay $100,000 per year for 24,114 square feet, of which 7,239 square

feet are in the subject premises and 16,875 square feet are in the adjacent 900 North Michigan building. Additionally, starting in March 1979, Scandinavian Design will pay an added $37,500 for 6,000 square feet of the leased space in the 900 North Michigan building. It should also be noted that Evans presently uses 1,773 square feet of the subject premises which Tiffany would have used.

To calculate the difference between the value of the present arrangements and the Tiffany contract, the Court must allocate the present value of (1) the Scandinavian Design sublease of the 7,239 square feet in the 920 North Michigan building, (2) the 16,875 square feet in the 900 building, and (3) the 1,773 square feet Evans (Blum's-Vogue) uses in the 920 building. The Court believes that the allocations Evans has suggested fairly represent its actual damages. From March 1, 1975 to February 28, 1979 the $100,000 Scandinavian Design rental should be allocated on the basis of $48,185 for the subject premises and $51,815 for the 900 North Michigan space. After March 1, 1979, the rental should be allocated on the basis of $66,255 for the subject premises and $71,245 for the 900 North Michigan space. The space Evans is presently using should be valued at $5,443 per year before March 1, 1979 and $7,445 per year after March 1, 1979. Evans' net loss of rental income therefore amounts of $455,223.[13]

Three additional items of damage are also recoverable to compensate Evans because of other differences between the Tiffany lease and the Scandinavian Design lease. Evans is entitled to recover the $20,-000 rental concession it gave Scandinavian Design on the first year rental; undoubtedly had this concession not been given, the overall Scandinavian Design rent would have been reduced throughout the term by a like amount. Evans also should recover $75,000 as the lost value of the separate Michigan Avenue entrance and elevator Tiffany had agreed to construct for Blum's-Vogue. As noted, Evans wanted this entrance to give Blum's-Vogue a separate Michigan Avenue identity. Evans also incurred $20,140 additional construction costs because Tiffany breached; this amount is compensable damages.

The Tiffany contract also provided that it would pay certain air conditioning expenses. Scandinavian Design has only agreed to pay 25% of the same costs. The annual expenses for running the air conditioning for 15⅔ amount to $74,808. The additional amount that Tiffany would have paid amounts to $57,797. This amount is recoverable.[14] Evans also claims $23,250 damages for the 75% share of the replacement cost of the unit. The evidence does not, however, show that the unit will need to be replaced and therefore this claim is not sustained.

Evans also claims substantial lost profits for Blum's-Vogue because Scandinavian Design occupies the premises rather than Tiffany. Evans also claims lost rental income from Brady C'est Bon. The theory of these three claims is that Tiffany's presence (the "Tiffany effect") would have caused a substantial increase in Blum's-Vogue sales volume as well as Brady's sales. Tiffany's occupancy also supposedly would have attracted additional tenants to the upper floors of the building. Evans maintains that the identity of a retailer's neighbors plays a major role in attracting customers, especially in the case of a retailer selling luxury items.

Tiffany argues that even if Evans would have benefited from Tiffany's presence as Evans alleges, *Branhill Realty Co., Inc. v. Montgomery Ward & Co.*, 60 F.2d 922 (2d Cir. 1932) prevents recovery for lost profits and increased rental revenue. In *Branhill*, Judge Swan held that a lessee repudiating a contract to lease commercial property was not liable for the enhanced fees and rental values of contiguous property when the lessee was not legally obligated to use the property for any particular purpose. How-

---

13. This sum must be reduced to present cash value.

14. This sum must be reduced to present cash value.

ever, the court expressly refused to decide what damages were recoverable if the lessee had absolutely agreed to occupy the premises proposed to be leased for a specific purpose.

■ In contrast, in the instant case the contract embodies the parties' intent in that the lessee (Tiffany) would use the property for a specific purpose. Here, unlike *Branhill,* the contract does not authorize Tiffany to use the property for any "commercial purpose" but rather obligates Tiffany to use the "premises for their use" and execute a formal sublease "within reasonable limitations." Among these limitations was execution of an appropriate use clause; the clause Tiffany originally suggested limited it to operations similar to its New York store and other stores. As noted above, Tiffany should be bound by the language it proposed; thus the Court finds that Tiffany was contractually obligated to occupy the premises with a Tiffany store. *Branhill,* therefore, is inapposite.

■ No case from Illinois dealing with the present factual circumstances and lost profits has been cited to the Court. We therefore must rely on general principles of Illinois contract law to determine whether lost profits are recoverable for the "Tiffany effect" where Tiffany was obligated to operate a fine jewelry store. Illinois law appears to allow recovery in breach of lease cases for all damages which were the natural and proximate result of the breach so long as such damages were within the contemplation of the parties. See *Ash v. Barrett,* 1 Ill.App.3d 414, 274 N.E.2d 149 (1971).

■ Evans has demonstrated that damages arising from the "Tiffany effect" were within the contemplation of the parties. From the beginning of the negotiations during the January 29th meeting, Meltzer informed Tiffany that he believed a major benefit of the bargain was that the mere presence of Tiffany would increase Blum's-Vogue customer traffic. The rental Evans offered was contingent on this fact. Thus if Evans can prove Tiffany's breach was the

proximate cause of lost profits damages, such sums are recoverable.

■ To prove lost profits damages, the fact of injury must be proved with some specificity, particularly where the alleged lost profits arise from a new business relationship. *Stanish v. Polish Roman Catholic Union,* 484 F.2d 713 (7th Cir. 1973). If injury is proven, the amount of loss is subject to more general proof, especially if defendant's breach makes exact calculations difficult. *Hannigan v. Sears, Roebuck & Co.,* 410 F.2d 285 (7th Cir. 1969). In the instant case, Evans' proof of the fact of loss was too uncertain for the Court to allow generalized proof of the amount of loss. The "Tiffany effect" supposedly arises from increased customer traffic caused by Tiffany's presence as a noted luxury merchandiser. Fur purchasers and luxury jewelry purchasers are not generally impulse sales, making street traffic a less important element of sales volume. Moreover, the Chicago fur market is highly competitive; testimony shows that many customers shop at several stores and negotiate for price. Additionally, Evans has been unable to show Blum's-Vogue sales volume and profit margin are not controlled by its presence in the North Michigan trade area generally rather than specific proximity to any one merchant. In sum, Evans failed to prove the fact of lost profits for Blum's-Vogue. Similarly, Evans' other lost profits rental income claims are not supported by the evidence.

■ As a final step in calculation of damages, Evans' recovery must be reduced to present cash value since certain elements of its damage would have been received in the future. The statutory rate of interest on judgments, 6%, is appropriate because this rate fairly ascertains the amount which, if awarded as a lump sum on which Evans can earn interest, will produce an award equivalent to the losses suffered during the term of the lease. Two elements of damages must be so reduced: the $455,223 in rent payments after March 1, 1975 and

the $57,797 in air conditioning expenses. Using the 6% figure, the present value of these sums, after 1975, is Three Hundred Fifty Four Thousand Seven Hundred and Seventeen Dollars ($354,717.00).[15] Evans' other damages as previously calculated amount to Two Hundred Forty-Four Thousand Two Hundred and Seven Dollars ($244,207). Evans' total recovery amounts to Five Hundred Ninety-Eight Thousand Nine Hundred and Twenty-Four Dollars ($598,924). Judgment will be entered in that amount with costs.

IT IS SO ORDERED.

January 29, 1973

Mr. Farnham Lefferts
Tiffany & Company
Fifth Avenue
New York, New York

Dear Mr. Lefferts:

The purpose of this letter is to cover your intent to lease the 1st and 2nd Floors and Mezzanine of the premises commonly known as 920 N. Michigan Avenue, coinciding with a certain Indenture of Lease dated the eleventh (11th) day of May, 1964 by and between Blum's Realty Co., an Illinois corporation and Blum's Vogue, Inc., for the period expiring May 31st, 1989. The basic terms of this sublease shall be as follows.

*Item No. 1*—Rental: $100,000.00 per annum payable in advance monthly.

*Item No. 2*—As additional rental the Sublessee shall pay one-fourth (¼th) of any additional tax increase levied annually, during the term of this sublease over and above that pro rata share of the taxes levied for the years 1973 and 1974 as they relate to the building as a whole.

*Item No. 3*—The sublessee shall make all improvements at its expense involved in the rehabilitation of the premises for their use, including the installation of a separate entrance, lobby, show windows and elevator providing access in the 900 N. Michigan Avenue building.

*Item No. 4*—The rentals paid shall be on a gross basis under which the Lessor will pay all general real estate taxes, assessments, insurance and over-all maintenance and operation of the building structurally and otherwise. The Lessor shall provide heat and maintain the two (2) passenger elevators servicing the demised premises. The Lessor shall turn over to the Lessee the existing air conditioning equipment in its present working condition and repair, which equipment shall be maintained by the Sublessee and operated at its expense, providing the electricity and water as required in its operation for its premises and the Third (3rd) Floor.

*Item No. 5*—Lessor will grant to the Sublessee ninety (90) days rent free from the date of lease execution which shall be no later than March 31, 1973, to cover a portion of the time required in installation, with an anticipated date of occupancy on or before November 1, 1973.

*Item No. 6*—Sublessee will maintain the sidewalks and insure its own plate glass. Lessor will likewise maintain its plate glass insurance on the Ground Floor.

It is the joint intention of both parties to enter into formal lease contracts embodying the above terms and conditions within reasonable limitations and to proceed with the closing as promptly as possible.

Yours very truly,

BLUMS, INC.

(s) David Meltzer
President

HLS/jam

> ACCEPTED:
>
> <u>(s) Farnham Lefferts</u> (SEAL)
> Tiffany & Company
>
> <u>January 29, 1973</u>
> Date

---

**15.** Of course, the 6% discount figure has been altered to reflect that an amount of items discounted should have been collected by January 1, 1976; $48,523 of the discounted items should have been received by Evans by this date.

## MEMORANDUM OPINION AND ORDER OF APRIL 14, 1976.

GRADY, District Judge.

This cause is before the Court on cross-motions[1] to amend the memorandum opinion and order entered by Judge McLaren January 29, 1976, pursuant to Fed.R.Civ.P. 52(b), 59(a).[2] In that opinion, Judge McLaren found that a binding contract existed between Evans and Tiffany and that Tiffany had breached the contract. Damages were assessed in the amount of $598,964.00. Evans seeks to raise this amount to $628,770.00, contending that a mathematical error occurred in discounting certain future payments to present value. Tiffany argues that the amount of judgment should be reduced by $92,584.58. Tiffany maintains that $75,000.00 assessed as damages for construction of a separate Michigan Avenue entrance and elevator is duplicative of $20,140.00 damages assessed for construction of a new glass-walled corridor in the 920 building. Tiffany also maintains Evans saved over $17,000.00 in reduced real estate commissions on the Scandinavian Design transaction as compared with the proposed Tiffany transaction.

██ Motions made under Fed.R.Civ.P. 52(b) and 59(a) are not intended merely to relitigate old matters nor are such motions intended to allow the parties to present the case under new theories. Instead, these motions are intended to correct manifest errors of law or fact or to present newly discovered evidence. *Canister Co. v. National Can Corp.*, 71 F.Supp. 49 (D.Del. 1946), *appeal dismissed*, 163 F.2d 683 (3rd Cir. 1947); *First Nat'l Bank of Dallas v. Rozelle*, 493 F.2d 1196 (10th Cir. 1974); *Zeveig v. Bethlehem Supply Co.*, 186 F.2d 20 (5th Cir. 1951). *See also* 6A J. Moore, *Moore's Federal Practice*, ¶ 59.07 at pp. 92–5. With these principles in mind, we believe that the damages must be recomputed to reflect proper calculation of the discount-

ing factor, but the damages should not be reduced under either new theory Tiffany asserts.

In the January 29 opinion, Judge McLaren held that the present value of those sums which Evans would have received in the future should be discounted at the rate of 6 per cent (which is the statutory rate of interest on judgments) "because this rate fairly ascertains the amount which, if awarded as a lump sum on which Evans can earn interest, will produce an award equivalent to the losses suffered during the term of the lease." (Memorandum Opinion and Order, pp. 57–58). Using the 6 per cent figure, Evans maintains that the judgment should be increased $29,846.00.

██ In response to this argument, Tiffany asserts that the 6 per cent discount factor is too low and that, in any event, the discounting factor should be used on a monthly basis rather than a semi-annual basis. In arguing that the 6 per cent figure is too low, Tiffany is attempting to relitigate issues previously presented. Under the principles stated above, this position must be rejected. With respect to applying the discounting factor on a monthly rather than a semi-annual basis, Tiffany's position is well-taken. It would be a manifest error of fact and inequitable to compute damages on a basis not contemplated by the January 29, 1973, letter agreement. Under this approach, properly calculated, the judgment should be increased by $26,524.21.

██ With respect to Tiffany's contention that the $75,000.00 of damages assessed for failure to construct the proposed Michigan Avenue entrance, lobby, show window, and elevator for Blum's-Vogue duplicates the award of $20,140.00 charged for construction of a new glass-walled corridor in the 920 building, the Court holds that Tiffany's position is not well-taken. It should be noted that Tiffany was on notice as early as entry of the comprehensive pre-trial order

---

1. These motions were made without waiving any claims the parties previously made concerning the computation of damages.

2. Judge McLaren died after issuing the January 29 opinion. This matter was then assigned here pursuant to the rules of the District Court for the Northern District of Illinois, and Fed.R. Civ.P. 63.

that Evans claimed both sums. At no time during trial or in its extensive post-trial written argument did Tiffany present its duplication argument. Tiffany, therefore, should not now be permitted to re-open and litigate this new theory.

Moreover, examination of the record as it presently stands amply demonstrates that no duplication of damages occurred. The $75,000.00 sum was intended to compensate plaintiff for loss of a completely separate Michigan Avenue entrance and identity which would have been accomplished by construction of the new show windows, entrance way, lobby and separate third elevator. See Dx 92, Memorandum Opinion and Order, p. 36. The glass-walled corridor accomplishes a different purpose and only minimally aids Evans in giving Michigan Avenue identification to Blum's-Vogue. The new corridor separates the two existing in-store elevators allowing Evans and Scandinavian Design each the exclusive use of one elevator. This is clearly a makeshift solution when compared with the more comprehensive remodeling contemplated in the Evans-Tiffany transaction. Thus, we believe that no manifest error of law or fact occurred when separate damages were awarded for the glass-walled corridor and the new Michigan Avenue entrance.

The third issue before the Court is whether the judgment must be reduced to reflect certain supposed differences in the real estate commissions on the Tiffany transaction when compared with the Scandinavian Design transaction. Again, it must be noted that Tiffany failed to make this argument at trial even though given more than ample opportunity. This silence on Tiffany's part appears to have been a conscious tactical decision, since Tiffany relied on the fact that Evans did not pay Howard Storch a commission on the Tiffany transaction as an indication that no contract existed. This being the case, Tiffany should not now be given the opportunity to reopen the record to present yet another wholly new theory.

Moreover, the record is replete with evidence that during the time period in question Storch did not consider himself, or act

as, Evans' agent. When Tiffany first contacted Storch in October 1972, he did not reveal to Evans Tiffany's interest; instead, at that juncture Storch attempted to structure a transaction directly between Tiffany and Evans' sub-lessor. Similarly, while the Evans-Tiffany negotiations proceeded, Storch attempted to lease space to Tiffany in another building which he owned, offered to purchase the subject premises from Evans' sublessor, and conferred and advised Tiffany how to structure the proposed transaction. In sum, these activities indicate that even if the Evans-Tiffany transaction had been consummated, Evans would not have been obligated to Storch.

It is therefore ordered that the Memorandum Opinion and Order of January 29, 1976, be amended to increase the judgment to $625,448.21 and that the cross-motions to amend be denied in all other respects. This opinion shall constitute the Court's supplemental findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

It is so ordered.