**In re: HIGHLAND SUPERSTORES, INC., Debtor.**

**UNSECURED CREDITORS' COMMITTEE OF HIGHLAND SUPERSTORES, INC., Plaintiff–Appellee,**

**v.**

**STROBECK REAL ESTATE, INC., Defendant–Appellant.**

**No. 97–1627.**

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1998.

Decided Aug. 28, 1998.

N. Neville Reid (argued and briefed), Mayber, Brown & Platt, Chicago, IL, for Plaintiff–Appellee.

Thaddeus J. Stauber (argued and briefed), Eckhart, McSwain, Silliman & Sears, Chicago, IL, for Defendant–Appellant.

Before: KRUPANSKY, SILER, and COLE, Circuit Judges.

## OPINION

COLE, Circuit Judge:

Appellant Strobeck Real Estate, Inc. ("Strobeck") appeals the district court's order reversing a judgment of the bankruptcy court and determining that Strobeck suffered no actual damages resulting from Debtor Highland Superstores, Inc.'s rejection of its pre-petition lease (the "Highland Lease").

For the reasons set forth below, we **REVERSE** the decision of the district court.

### I.

The relevant facts are not in dispute. Strobeck leased to Highland Superstores, Inc. ("Debtor") certain commercial real estate in a shopping center located in Hoffman Estates, Illinois. On August 24, 1992 (the "Petition Date"), the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

As of the Petition Date, the Debtor was in default under the Highland Lease with arrears of $190,632.35, and it had 14 years and 160 days remaining on the 20–year lease. Section 18.02 of the Highland Lease provided:

In the event of any default specified in Section 18:01, Paragraph (i), (ii) and (iii) hereof, Landlord shall have the right to terminate this Lease or from time to time,

without terminating this Lease, to relet the Demised Premises or any part thereof, upon such reasonable terms and conditions as Landlord shall deem advisable. The avails of such reletting shall be applied first to the payment of the reasonable cost of repossessing and reletting the Demised Premises; second, to the payment of the minimum rental and real estate taxes due hereunder and the residue, if any, shall be held by Landlord and applied in payment of future minimum rental and real estate taxes, as the same shall become due and payable hereunder. Should the avails of such reletting during any month be less than the minimum rental reserved hereunder, then Tenant shall, during each month, pay such deficiency to Landlord.

On the Petition Date, the Debtor publicly announced its intention to cease operating in Illinois; thereafter, it proceeded to close all its Illinois stores, including the store located in Hoffman Estates. Having failed to obtain a replacement tenant for the Highland Lease, the Debtor filed a motion to reject that lease. The bankruptcy court granted the Debtor's motion. Under 11 U.S.C. § 365(g), the Debtor's rejection of the unexpired Highland Lease constituted a breach of the lease that is deemed to have occurred immediately prior to the Petition Date.

Strobeck subsequently leased the subject space, as well as an additional 10,555 adjoining square feet, to Syms Corporation. The new lease (the "Syms Lease"), which commenced on September 2, 1993, provided for a term of ten years and five months, with two five-year-term renewal options. Although the initial term of the Syms Lease expires on January 31, 2004, which precedes the Highland Lease's expiration date of January 31, 2007, the bankruptcy court assumed in its claims analysis that payments under the Syms Lease would continue through January 31, 2007. That assumption was not challenged by the parties.

Strobeck filed a timely proof of claim in the amount of $839,871.46, arising out of the Debtor's rejection of the Highland Lease. Strobeck subsequently amended its claim to $923,446.98. The Unsecured Creditors' Committee (the "Committee") thereafter filed initial and supplemental objections to Strobeck's proof of claim.

■ The bankruptcy court held an evidentiary hearing in order to determent Strobeck's actual damages. Strobeck argued that its actual damages first must be determined based upon the language contained in the Highland Lease and applicable state law, in this case Illinois, with the actual damages then being limited by application of 11 U.S.C. § 502(b)(6).[1] Strobeck also argued that the court should apply Illinois' statutory rate of interest on judgments to compute the present value of the difference between the future streams of income under the Highland and Syms Leases.

The Committee proposed a different method of calculating Strobeck's damages resulting from rejection of the Highland Lease. The Committee urged the bankruptcy court to determine the amount of Strobeck's claim by discounting to present value the stream of future payments that would have been received under both the Highland and Syms Leases, using discount rates that factor in the relative creditworthiness of the Debtor and Syms.[2] The Committee conceded that the approach it advocated had not been adopted by any court of law. The Committee argued, however, that its approach was in harmony with general equitable bankruptcy principles. Had the bankruptcy court followed the approach espoused by the Committee, it would have been compelled to conclude that Strobeck suffered no damages from rejection of the Highland Lease inasmuch as

---

**1.** Section 502(b)(6) of the Bankruptcy Code imposes a limit or cap on the damages a lessor may claim as a result of a debtor's lease rejection. See discussion *infra* at 576–77.

**2.** At the evidentiary hearing, the Committee offered the testimony of an expert who analogized real estate leases to corporate bonds rated by and published in *Moody's Bond Record* in 1992, and opined that the Debtor had the equivalent of a "C" credit rating, while Syms had an "A" credit rating. Based on that rating system, the Committee's expert concluded that Syms's creditworthiness was far superior to that of the Debtor.

Syms was a much more creditworthy replacement tenant and, thus, the present value of its future performance under the Syms Lease exceeded the present value of the Debtor's future performance under the Highland Lease. Relying on overwhelming case authority that a determination of lease rejection damages is computed in accordance with the terms of the debtor's lease and applicable state law, the bankruptcy court adopted Strobeck's approach and allowed its claim in the amount of $923,446.98, as limited by 11 U.S.C. § 502(b)(6).[3]

On appeal, the district court, in apparent acknowledgment of the utter lack of precedential support for the approach advanced by the Committee, stated that "I am going to accept the argument of the Committee and see whether the law does develop in the direction toward which [the Committee is] pointing." The district court thus reversed the bankruptcy court and instead adopted the Committee's proposed methodology, effectively eliminating Strobeck's claim in its entirety.[4] Accordingly, the district court disallowed Strobeck's claim. This timely appeal followed.

## II.

"We review a bankruptcy appeal differently than a typical appeal from the district court. The bankruptcy court makes initial findings of fact and conclusions of law. The district court then reviews the bankruptcy court's findings of fact for clear error and the bankruptcy court's conclusions of law de novo." *Wesbanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Servs. Inc.)*, 106 F.3d 1255, 1259 (6th Cir.) (citing Fed. R. Bankr.P. 8013), *cert. denied*, —— U.S. ——, 118 S.Ct. 65, 139 L.Ed.2d 27 (1997). We in turn review the bankruptcy court's findings of fact for clear error and the district court's legal conclusions de novo. *See id.* (citing *First Nat'l Bank v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 717 (6th Cir.1992)).

## III.

On appeal, we are asked to determine a single issue: what is the appropriate method by which to calculate a lessor's claim for damages arising out of the breach of a commercial lease; specifically, whether, for purposes of determining the present value of the future stream of payments under the respective leases, the bankruptcy court should have calculated and applied two different discount rates that account for the relative creditworthiness of each tenant.

---

**3.** The bankruptcy court calculated the amount of Strobeck's actual damages to be $930,484.37 by adding together the first three amounts listed below and subtracting the fourth amount as follows:

(1) First, the bankruptcy court computed the total rent deficiency between the Highland Lease and the Syms Lease for the remaining fourteen years and 157 days of the Highland Lease, which yielded $914,106.60. Next, that amount was discounted to present value by 9%, which was the prevailing Illinois statutory judgment rate at the time of the evidentiary hearing;

(2) Second, that amount then was added to the amount of rent due from the Debtor as of the date of the filing of its petition, which was $190,632.35;

(3) Third, the bankruptcy court also added the reasonable cost of repossession and reletting the premises occupied by the Debtor, which was $183,540.00; and

(4) Finally, the bankruptcy court had to deduct lease payments of $72,357.75 made by the Debtor to Strobeck after its bankruptcy petition was filed.

This formula, which was based on the Highland Lease and Illinois law, yielded total actual damages of $930,484.37. Strobeck's actual damages, however, are limited by 11 U.S.C. § 502(b)(6) to $923,446.98; thus, Strobeck's claim was allowed in the amount of $923,446.98.

**4.** The Committee's expert applied a different discount rate to each lease based on the Debtor's and Syms's credit ratings. He quantified the respective risk-based discount rates as 24% for the Debtor and 11.5% for Syms. The Committee's expert thus calculated Strobeck's actual damages as the sum of the following: (1) present value at a 24.0% discount rate of the rent due under the Highland Lease (yielding $1,402,627 after discount); (2) minus present value at 11.5% of the rent to be received from reletting the premises (yielding $1,880,746 after discount); (3) plus the cost of reletting ($190,000.55); (4) plus rent due from the Debtor as of the petition date ($190,-632.35); and (5) minus post-petition rent paid by the Debtor. This approach, which was accepted by the district court, yielded negative actual damages of $176,305, thus precluding the application of the statutory limit of section 502(b)(6).

## A.

In answering this question, we first turn to the applicable language of the statute. Section 502(b)(6) of the Bankruptcy Code provides:

> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> . . .
>
> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—
>
>> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—
>>
>> (i) the date of the filing of the petition; and
>>
>> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>
>> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates; . . . .

11 U.S.C. § 502(b)(6).

▅▅▅ Section 502(b)(6) is aimed at compensating a lessor for his loss while not allowing a claim "so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering a dividend from the estate. Thus, Congress intended to compensate landlords for their actual damages while placing a limit on large future, speculative damages which would displace other creditors' claims." *Vause v. Capital Poly Bag, Inc.*, 886 F.2d 794, 801–02 (6th Cir.1989).

The courts that have applied section 502(b)(6)'s framework for determining the allowable amount of a lessor's total rejection damage claim generally employ a four-step process. First, the court calculates the total rents due under the lease from the earlier of the date of filing or the date on which the lessor repossessed or the lessee surrendered the leased property.[5] Second, the court determines whether 15% of that total is greater than the rent reserved for one year following the debtor's filing. Third, the 15% amount is compared to the rent reserved under the applicable lease for three years following the filing. Finally, the court, on the basis of the foregoing calculations, arrives at the total allowable amount of the landlord's rejection damages. *See, e.g., In re Financial News Network, Inc.*, 149 B.R. 348, 351 (Bankr. S.D.N.Y.1993); *In re Atlantic Container Corp.*, 133 B.R. 980, 989 (Bankr.N.D.Ill.1991).

▅▅▅ The calculation of rejection damages as outlined above assumes the existence of a claim. Because a lessor has a duty to mitigate its damages, *see In re Bob's Sea Ray Boats, Inc.*, 143 B.R. 229, 231 (Bankr.D.N.D. 1992), if the lessor has relet the premises at a higher rent, it generally will have no section 502(b)(6) claim. The Committee and Strobeck do not quarrel over the proper methodology for applying section 502(b)(6)'s limitation on rejection damages. Rather, it is the threshold question of whether Strobeck has a cognizable claim in the first instance on which the parties disagree.

Strobeck contends that its damages should be calculated by reference to the Highland Lease and Illinois law. It argues that the bankruptcy court properly calculated the lessor's actual damages under nonbankruptcy law (*i.e.*, under the terms of the rejected Highland Lease and pursuant to Illinois law).

The Committee, on the other hand, advocates an approach that is unsupported by case law and has not been employed by any previous court in the context of calculating a lessor's lease rejection claim. Specifically, the Committee contends that Strobeck's

---

**5.** Although the statute is silent on this point, Strobeck and the Committee agree that the total future rents due under the Highland Lease must be discounted to present value. Because the parties are in agreement as to this issue, we need not decide whether section 502(b)(6) generally requires a discounting of total future rents due under the applicable lease.

method of determining the difference between the respective future streams of income under the Highland and Syms Leases is inaccurate because it does not apply a discount rate for the future rental stream under each lease that accounts for the respective credit ratings of the Debtor and Syms. Stated differently, the Committee argues that the bankruptcy court should have adjusted the discount rate (used to calculate the present value of the respective rental streams under the Highland and Syms Leases) to account for the risk that the Debtor or Syms may not have been able to make all future payments over the respective lease terms, rather than relying on Illinois' statutory judgment rate for such a computation.

The Committee's argument relies heavily on two companion cases, *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1937), and *City Bank Farmers Trust Co. v. Irving Trust Co.*, 299 U.S. 433, 57 S.Ct. 292, 81 L.Ed. 324 (1937). According to the Committee, *Kuehner* and *City Bank* established a federal rule for determining a lessor's damages when a debtor in bankruptcy rejects its lease. In *Kuehner*, the Supreme Court stated in dicta that the amount of a lessor's damages for rejection of a prepetition lease should be based on the difference between the remaining payments under the debtor's rejected lease and the present rental value of the property, as limited by the Bankruptcy Act's statutory predecessor to section 502(b)(6). 299 U.S. at 450, 57 S.Ct. 298. The court in *City Bank*, again in dicta, approved this same formula for calculating rejection damages. 299 U.S. at 443–44, 57 S.Ct. 292.

The central issue addressed in *Kuehner* and *City Bank* was the construction and constitutionality of the statutory predecessor to section 502(b)(6), which had enlarged the category of provable bankruptcy claims to include one by a lessor for damages arising from the debtor's lease rejection. We find nothing in *Kuehner* and *City Bank* suggestive of the Supreme Court's intent to adopt a uniform federal rule governing computation of a lessor's rejection damages without regard to state law. But we need not decide whether the formula approved in dicta in the *City Bank* and *Kuehner* cases is necessarily the correct, or only appropriate, method for calculating a lessor's rejection damages. For even if we assume (as does Strobeck) that *City Bank* and *Kuehner* establish the appropriate starting point, we are not prepared— on the strength of the vague equitable notions the Committee urges us to apply—to make the quantum leap of law and logic necessary to reach the Committee's conclusion that Strobeck has in fact suffered no damages as a result of Debtor's rejection of the Highland Lease.

Relying on the Supreme Court's decision in *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), the Committee urges us to apply equitable principles, rather than state law, in determining Strobeck's actual damages. But *Vanston* merely states that "[i]n determining what claims are allowable and how a debtors assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits.... [B]ankruptcy courts must ... determine how and what claims shall be allowed under equitable principles." 329 U.S. at 162–63, 67 S.Ct. 237. The *Vanston* Court also recognized, however, that "[w]hat claims of creditors are valid and subsisting against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law is to be determined by reference to state law." *Id.* at 161, 67 S.Ct. 237. Further, the Supreme Court later held in *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), that even though Congress has the constitutional authority to establish uniform bankruptcy laws, it "has generally left the determination of property rights in the assets of a bankrupt estate to state law." *Id.* at 54, 99 S.Ct. 914. And, we have previously held that equitable principles set forth in *Vanston* "have never been applied ... to oust state law in the original determination of the existence and amount of liability." *Ohio v. Collins (In re Madeline Marie Nursing Homes)*, 694 F.2d 433, 437 (6th Cir. 1982).[6]

▮▮▮ Bankruptcy courts simply do not have free rein to ignore a statute in the

6. *See also United States v. Sanford (In re San-* *ford)*, 979 F.2d 1511, 1513 (1992) (11th Cir.

exercise of their equitable powers pursuant to 11 U.S.C. § 105.[7] " '[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.' " *XL/Datacomp, Inc. v. Wilson (In re Omegas Group, Inc.)*, 16 F.3d 1443, 1453 (6th Cir.1994) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)). Here, the bankruptcy court correctly recognized that it did not have the authority to announce, independent of any precedent, that equity requires a state law claim for breach of contract to be discounted to present value based upon the relative creditworthiness of the Debtor and Strobeck's replacement tenant. *See, e.g., Architectural Bldg. Components v. McClarty*, 137 F.3d 919, 924–25 (6th Cir.1998) (holding that a bankruptcy court did not have authority, as a matter of equity, to impose a surcharge against an unsecured subcontractor, after subcontractor was awarded funds from settlement reached between general contractor and Chapter 7 trustee for subcontractor's parent company, because surcharge was not otherwise authorized by the Bankruptcy Code). We therefore reject the Committee's suggestion that *Vanston,* upon which the district court so heavily relied, authorizes us to sweep aside state law—in favor of general equitable principles—in computing Strobeck's rejection damages claim.

The lower courts applying section 502(b)(6) likewise have not concluded that general equitable principles require a departure from state law in the calculation of rejection damage claims. They have uniformly held that a lessor's damages are computed in accordance with the terms of the debtor's lease and applicable state law, and then are limited by application of section 502(b)(6). *See, e.g., In re Gantos, Inc.*, 176 B.R. 793, 795 (Bankr. W.D.Mich.1995) (stating that after the lessor computes the value of its claim under applicable nonbankruptcy law, the claim is compared with, and limited by, section 502(b)(6)); *In re Iron–Oak Supply Corp.*, 169 B.R. 414, 418–20 (Bankr.E.D.Cal.1994) (stating that in determining actual damages the court must take into account both the terms of the lease and applicable state law); *In re Financial News Network, Inc.*, 149 B.R. at 351 (holding in a Chapter 11 case that actual damages are to be determined by reference to the terms of the lease); *In re Conston Corp., Inc.*, 130 B.R. 449, 453 (Bankr.E.D.Pa.1991) (computing a landlord's damages under state law, and then applying § 502(b)(6)'s limit); *In re Goldblatt Bros., Inc.*, 66 B.R. 337, 346 (Bankr.N.D.Ill.1986)(same).

We agree with the conclusion reached by these courts. Presumably, if Congress had intended to include in section 502(b)(6)'s claim calculus the element of risk arising from the debtor's creditworthiness—which would be a factor in nearly every bankruptcy proceeding because bankrupt debtors are almost invariably uncreditworthy—it would have expressly so provided in the statute. By enacting the rejection damages limitation contained in section 502(b)(6), Congress has established the appropriate safeguard to limit the risk that lessors will receive a windfall at the expense of other unsecured creditors. The Court need not embrace the Committee's draconian approach to achieve this end. *See In re Allegheny Int'l,* 136 B.R. 396, 405 (Bankr.W.D.Pa.1991) (declining invitation to further reduce lessor's rejection damages claim, which had been limited by application of section 502(b)(6)'s formula, and noting that "application of the cap provided in section 502(b)(6) makes a reduction to present value unnecessary").

## B.

The Committee's unprecedented approach also would require us to turn a

---

1992) (stating that a claim against the bankruptcy estate will not be allowed in a bankruptcy proceeding if the same claim would not be enforceable against the debtor outside of bankruptcy); *First City Beaumont v. Durkay (In re Ford )*, 967 F.2d 1047, 1050 n. 6 (5th Cir.1992) ("State law is the appropriate law for determining the validity of an underlying claim."); *Canal Corp. v. Finnman (In re Johnson )*, 960 F.2d 396, 404 (4th Cir.1992) (stating that the existence of a claim is a question of state law); *In re Chicago, Milwau-*

*kee, St. Paul & Pac. R.R.,* 791 F.2d 524, 532 (7th Cir.1986) ("Bankruptcy law provides a federal machinery for enforcing creditors' rights but the rights themselves are created by state law.").

**7.** 11 U.S.C. § 105(a) provides that a bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

blind eye toward fundamental principles of contract law. In awarding damages for breach of contract (*e.g.,* a lease), it is well established that the nonbreaching party is entitled to damages for its "expectation interest," *i.e.,* damages sufficient to place the nonbreaching party in as good a position as the party would have been had the contract been performed. Restatement (Second) of Contracts §§ 344, 347 (1981). The Committee seeks to convince us that Strobeck has received more than the benefit of its bargain with the Debtor because Syms, the replacement tenant, is better able to pay. However, the Committee's expert acknowledged that by the year 2007, Strobeck will have lost $1.2 million due to Highland's lease rejection and Strobeck's subsequent reletting of the premises at a lower rental amount. Therefore, the Committee's "less-is-more" approach to calculating the amount of Strobeck's claim flies in the face of settled contract law and has no foundation in Illinois precedent.[8] Neither *Vanston*—nor any other authority

of which we are aware—would permit us to jettison well-established principles of state contract law in favor of the creative, yet radical, approach advanced by the Committee.[9]

■ Nor do we find persuasive the so-called "cram-down" bankruptcy cases cited by the Committee, *see e.g., In re Camino Real Landscape Maintenance Contractors,* 818 F.2d 1503 (9th Cir.1987) (Chapter 11 plan); *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982) (Chapter 13 plan); and *In re Claeys,* 81 B.R. 985 (Bankr. D.N.D.1987) (Chapter 12 plan). In "cram-down" cases, bankruptcy courts attempt to calculate how much a secured creditor must be paid in order to receive the full value of its secured claim in a reorganization case, as the secured creditor's claim will be paid out over time, rather than, as in the present case, in a lump sum as part of a Chapter 11 liquidation.[10] As such, they are a distant cousin to the case before this Court. Accordingly, the "cram-down" cases relied on by the Committee as authority for the equitable

---

**8.** The Committee offers no Illinois authority supportive of its proposed damages calculation. And, *Evans, Inc. v. Tiffany & Co.,* 416 F.Supp. 224 (N.D.Ill.1976), which was cited by Strobeck, counsels against adoption of the Committee's approach. There, the district court was faced with determining the rental damages incurred by a lessor arising out of a breach of a commercial lease in Illinois. After calculating the lessor's total rental deficiency, the district court discounted the sum to present cash value by using the prevailing six percent statutory rate of judgment interest. *Id.* at 242. In doing so, the court noted that the statutory rate was appropriate because it "fairly ascertains the amount which, if awarded as a lump sum on which Evans can earn interest, will produce an award equivalent *to the losses suffered during the term of the* lease." *Id.*

**9.** Strobeck provides an excellent hypothetical to illustrate how the Committee's position would turn existing principles of contract law on their head. Suppose a lessor of an apartment building leases identical apartments to Bill Gates, reputed *to be the wealthiest person in the United States,* and to a destitute individual. Assume both persons default under their leases on the same day and vacate the apartments. Further assume that the apartment owner cannot relet either apartment. The lessor thereafter sues both persons for breach of the lease, requesting actual damages. Under the traditional approach advanced by Strobeck and hornbook contract law, the actual damages would be the same: both persons

must pay the rent remaining on the lease term, reduced to present value using the rate at which the apartment owner can invest those funds to be placed in the same position as if both persons had performed the lease.

The Committee's approach leads to a radically different result. Bill Gates's damages would be reduced to present value using an extremely low discount rate, reflecting the minimal risk that an individual possessing a large net worth would be unable to pay rent on an apartment; accordingly, the damages awarded against Gates would be quite high. In contrast, the award of damages against the destitute individual would be quite low because it would have been discounted at a very high rate, reflecting the higher nonpayment risk associated with that individual.

Under basic contract law, however, the ability of a breaching promisor to pay does not affect the promisee's award of damages. While the lessor's ability to collect a judgment against Bill Gates would be greater, contract law does not distinguish between the two individuals in determining the value of the lessor's award of damages. In short, collectibility is simply not factored into the calculation of damages for breach of contract.

**10.** Under Chapters 11, 12 and 13 of the Bankruptcy Code, a bankruptcy court has the power to confirm a debtor's reorganization plan over objections by dissenting creditors. *See* 11 U.S.C. §§ 1129(b), 1225(b) and 1325(b). Bankruptcy Code sections 1129, 1225 and 1325 set out the

principle espoused here (*i.e.*, that the risk of nonpayment must be considered in determining the existence and amount of a lessor's rejection claim) are not analogous.[11]

In sum, although the Committee has advanced an elegant and creative argument, at bottom, it is fatally flawed. Accordingly, we hold that the district court erred when it concluded as a matter of law that, for purposes of calculating the present value of Strobeck's claim, the bankruptcy court should have applied two different discount rates to the total future rental streams under the Highland and Syms Leases in order to account for the relative creditworthiness of the Debtor and Syms. In doing so, we adopt the widely accepted rule that a lessor's damages arising out of a debtor's lease rejection are determined in accordance with the terms of the debtor's lease and applicable state law, and then are limited by application of section 502(b)(6).

### IV.

For the foregoing reasons, we **REVERSE** the judgment of the district court.

---

requirements a debtor's plan must meet for the court to exercise its cram-down powers. While these sections have many differences, all contain, in several subsections, the language that payments under a plan must be "of a value, as of the effective date of the plan, equal to the allowed amount of the claim." *See, e.g.,* 11 U.S.C. § 1129(b)(2). As the legislative history to section 1129 explains, Congress included this language to "recogniz[e] the time value of money," H.R.Rep. No. 595, 95th Cong., 1st Sess. 413 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6369, by requiring "a present value analysis that will discount value to be received in the future." *Id.* at 408, 414, 1978 U.S.C.C.A.N. at 6364, 6370. The legislative history goes on to state that the proper way to comply with the required present value analyses is to add interest to a debtor's proposed payments under the plan at a rate equal to the present value discount rate. *Id.* at 414–15, 1978 U.S.C.C.A.N. at 6370–71.

11. The Committee also insists that this court's decision in *Manufacturer's Hanover Trust v. Ward (In re Ward),* 857 F.2d 1082, 1083 (6th Cir.1988) articulates a principle of law that applies in this setting. Specifically, the Committee believes that

*Ward* stands for the proposition that a creditor may not shift the risk of nonpayment to other unsecured creditors when the creditor has failed to make a credit investigation. The Committee claims that Strobeck is doing precisely that in this case if it is allowed a claim that fails to take account of the fact that Strobeck dealt with a less creditworthy tenant (*i.e.,* the Debtor) and likely charged it higher rent to offset this risk.

*Ward* is easily distinguishable from this case. *Ward*'s fundamental pronouncement is that "[a] lender must investigate creditworthiness and ferret out ordinary credit information" as a precondition of demonstrating the required element of reliance in seeking an exception to discharge of a debtor's obligation under 11 U.S.C. § 523(a)(2)(A) on account of the debtor's actual fraud. *Id.* at 1086. *Ward*'s holding is directed at the first element (*i.e.,* reliance) of an actual fraud inquiry under section 523(a)(2)(A) and does not endorse a broad "assumption-of-the-risk" principle for all creditors under all circumstances. Thus, the Committee's reliance on *Ward* is misplaced, stretching its holding far beyond its unique factual setting (*i.e.,* an exception to discharge for credit card debt under section 523(a)(2)(A)).