**In re PHAR–MOR, INC.,
et al., Debtors.**

**No. 01–44007.**

United States Bankruptcy Court,
N.D. Ohio.

Jan. 5, 2006.

Michael Gallo of Nadler, Nadler & Burdman Co. LLP, Youngstown, OH, for Phar Mor.

Darlene M. Nowak of Marcus & Shapira LLP, Pittsburgh, PA, for Giant Eagle & Valu Eagle.

## MEMORANDUM OPINION

KAY WOODS, Bankruptcy Judge.

This cause is before the Court on the parties' cross motions for summary judgment on the amount, if any, that Giant Eagle, Inc. ("Giant Eagle") and Valu Eagle Associates ("Valu Eagle" collectively "Lessors") should be allowed as (i) administrative expenses on Lessors' Amended Applications and Requests for Administrative Expenses (Claim Nos. 88880026 and 88880009), and (ii) Lessors' proofs of claims, as amended (Claim Nos.1922 and 1924), for damages arising from the rejection of Lessors' equipment leases. Phar–Mor Inc., *et al.* ("Debtor") objected to the Lessors' four claims in the Debtor's Thirteenth and Fourteenth Omnibus Objections to Claims. The parties jointly filed stipulations of fact and each party filed

responses and reply briefs to the motions for summary judgment.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334(b). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b), 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052.

## I. STANDARD OF REVIEW

The procedure for granting summary judgment is found in FED. R. CIV. P. 56(c), made applicable to this proceeding through FED. R. BANKR. P. 7056, which provides, in part, that:

> [t]he judgment sought shall be rendered forth-with if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED. R. BANKR. P. 7056(c). Summary judgment is proper if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it could affect the determination of the underlying action. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Tenn. Dep't of Mental Health & Retardation v. Paul B.*, 88 F.3d 1466, 1472 (6th Cir.1996). An issue of material fact is genuine if a rational fact-finder could find in favor of either party on the issue. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.)*, 224 B.R. 27 (6th Cir. BAP 1998). Thus, summary judgment is inap-

propriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In a motion for summary judgment, the movant bears the initial burden to establish an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Gibson v. Gibson (In re Gibson)*, 219 B.R. 195, 198 (6th Cir. BAP 1998). The burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, in responding to a proper motion for summary judgment, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir.1989) (quoting *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505). That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *Street*, 886 F.2d at 1479.

## II. FACTS

The following are stipulated or uncontested facts, as set forth in Debtor's and Lessors' pleadings:

Debtor formerly operated a chain of discount drugstores with its principal headquarters in Youngstown, Ohio. On May 1, 1995, Debtor entered into a lease with Giant Eagle for warehouse equipment located at the Tamco warehouse in Austin-

town, Ohio (the "GE/PM Lease"). The lease required a monthly payment of Forty–Four Thousand Four Hundred Ninety–Six and 45/100 Dollars ($44,496.45). Also on May 1, 1995, Debtor entered into a separate and distinct lease with Valu Eagle for warehouse equipment located at the Tamco warehouse (the "VE/PM Lease"), which contained a monthly rental rate of One Thousand Eight Hundred Thirty–Two and 46/100 Dollars ($1,832.46). Each of the Leases was to terminate on September 1, 2008—thirteen (13) years and four (4) months after the commencement date.

On September 24, 2001, Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. On July 18, 2002, this Court entered a Sale Order authorizing the sale of substantially all of Debtor's assets to Hilco Merchant Resources, LLC, The Ozer Group LLC (the "Hilco/Ozer Group") and other identified designees, subject to an agency agreement between the parties ("Agency Agreement"). The Sale Order included the sale of all of Debtor's inventory at the Tamco warehouse. The Sale Order authorized Debtor to terminate its business operations at the Tamco warehouse and reject the real property lease for the warehouse effective as of the closing date of the sale (i.e., July 18, 2002). Subsequently, pursuant to Order of this Court dated September 30, 2002, Debtor rejected the GE/PM Lease and the VE/PM Lease.

On or about October 31, 2002,[1] Giant Eagle entered into a lease with Snyder Drugstores, Inc. ("Snyder") for the same equipment covered by the GE/PM Lease at the same rental rate, but with a termination date approximately four (4) years longer, i.e., October 31, 2012 (the "GE/Snyder Lease"). On or about October 31, 2002, Valu Eagle entered into a lease with Snyder for the equipment covered by the VE/PM Lease at the same rental rate and with a termination date of October 31, 2012 (the "VE/Snyder Lease" and collectively, the "Snyder Leases"). The parties dispute whether Debtor was involved in either Giant Eagle's or Valu Eagle's mitigation of the GE/PM or the VE/PM Leases.

Giant Eagle calculates its damages, as a result of rejection of the GE/PM Lease, to be One Million Six Hundred Ninety–Two Thousand Three Hundred Twenty–Five and 48/100 Dollars ($1,692,325.48) (Claim No.1922). Giant Eagle reaches this calculation by multiplying the monthly rental rate of Forty–Four Thousand Four Hundred Ninety–Six and 45/100 Dollars ($44,-496.45) by the seventy-one (71) months remaining on the lease term at the time of rejection, for a total of Two Million Five Hundred Eighty Thousand Six Hundred Forty–Two and 60/100 Dollars ($2,580,-642.60).[2] Giant Eagle credits against this amount the rent it received from Snyder pursuant to the GE/Snyder Lease in the amount of Six Hundred Twenty–Two Thousand Nine Hundred Fifty and 30/100 Dollars ($622,950.30). Giant Eagle did not deduct from the total (i) the amount of Fifty–Two Thousand Two Hundred Eleven

1. The Responses filed by Giant Eagle and Valu Eagle to the Thirteenth and Fourteenth Omnibus Objections to Claims state that their leases with Snyder became effective on October 1, 2002; however, because the Stipulations Relating to the Debtor's Equipment Leases with Giant Eagle and Valu Eagle ("Stipulations") filed jointly by the parties state that Giant Eagle and Valu Eagle entered into leases on or about "October 31, 2002" with Snyder (¶¶ 14 and 15), the Court will use the date of October 31, 2002 as the date that the Lessors re-let the equipment.

2. This is the present value of the stream of lease payments. Pursuant to Section 17 of the GE/PM Lease, a seven percent (7%) discount rate was used.

Dollars ($52,211.00) that Giant Eagle and Valu Eagle received from the sale of the equipment or (ii) the estimated ten percent (10%) for the equipment Lessors moved for their own other uses.[3]

Valu Eagle calculates its damages from rejection of the VE/PM Lease using the same methodology and arrives at a total claim amount of Sixty–Nine Thousand Six Hundred Sixty–Nine and 13/100 Dollars ($69,669.13) (Claim NO.1924). This calculation is based on seventy-one (71) months of rent at the rate of One Thousand Eight Hundred Thirty–Two and 46/100 Dollars ($1,832.46) (reduced to present value) for a total of One Hundred Six Thousand Two Hundred Seventy–Six and 44/100 Dollars ($106,276.44) less Twenty–Five Thousand Six Hundred Fifty–Four and 44/100 Dollars ($25,654.44) Valu Eagle received from Snyder pursuant to the VE/Snyder Lease.

Debtor operated its business and used the leased equipment at the Tamco warehouse from the petition date through July 17, 2002 The parties dispute who benefited from the use of the leased equipment from July 18, 2002 to the rejection date, September 30, 2002. This dispute is based, in part, because The Hilco/Ozer Group, as the Court approved liquidators, used the equipment to conduct the inventory at the warehouse. As part of the liquidation and as set forth in the Sale Order, the Hilco/Ozer Group arranged for Giant Eagle to purchase a large amount of non-private label warehouse inventory.[4] In addition, the equipment was used for property that was not disposed of by the liquidators.

For the period September 24, 2001 through July 17, 2002, Debtor paid only a portion of the monthly rental payments due under the GE/PM and VE/PM Leases. Debtor failed to pay Ninety–Six Thousand Three Hundred Seventy–Five and 72/100 Dollars ($96,375.72) to Giant Eagle as administrative rent for the period September 24, 2001 through July 17, 2002 and did not pay any administrative rent under the GE/PM Lease for the period July 18, 2002 through September 30, 2002. The total amount of rent for this period is One Hundred Nine Thousand Eighty–Eight and 70/100 Dollars ($109,088.70). Giant Eagle has filed an amended administrative claim for these amounts (Claim No. 88880026).

Debtor failed to pay Valu Eagle Four Thousand Five Hundred Ninety–Seven and 59/100 Dollars ($4,597.59) in rental payments for the period September 24, 2002 through July 17,2002 and did not pay Four Thousand Four Hundred Ninety–Two and 48/100 Dollars ($4,492.48) for the period July 18, 2002 through September 30,2002. Valu Eagle has filed an amended administrative claim for these amounts (Claim No. 88880009).

Snyder filed a bankruptcy petition in this Court on September 11, 2003. Subsequently, Snyder rejected the Snyder Leas-

**3.** Paragraph 23 of the Stipulations provides that: "GE and VE . . . sold some equipment, moved no more than 10% to other uses and abandoned the rest as too costly to move. GE and VE received the proceeds of the sale, $52,211.00." There is no allocation of the amount that Giant Eagle received versus what Valu Eagle received. Neither the proceeds of sale nor the value of the retained equipment has been deducted from the present value stream of payments in either Claim No.1922 or Claim No.1924. Because receipt of the proceeds from sale of the equipment and re-

tention of part of the equipment constitute elements of mitigation, such amounts should have been deducted by Giant Eagle and Value Eagle in calculating their rejection damages claims.

**4.** Lessors state that the Giant Eagle purchase agreement with the liquidators was necessary to receive the highest possible bid from the liquidators. Debtor states that Giant Eagle benefited by paying a reduced price for the inventory it received from the liquidation.

es on November 30, 2003. Snyder paid all administrative expenses under the Snyder Leases for the period November 1, 2002 through November 30, 2003. Snyder has not paid any amount on the Snyder Leases after November 30, 2003. Subsequent to the rejection, Snyder returned the equipment to the Lessors.

Lessors filed proofs of claim in the Snyder bankruptcy proceedings. Snyder's plan of reorganization was confirmed on April 5, 2004 and provided for payment of no more than six percent (6%) to unsecured creditors, including the claims arising from the rejected Snyder Leases. Lessors have not received any payments on their lease rejection claims.[5]

After Snyder returned the equipment, Lessors tried unsuccessfully to re-lease the equipment. As a result, Lessors sold some of the equipment, moved less than ten percent (10%) of the equipment to use elsewhere and abandoned the rest. Lessors received Fifty–Two Thousand Two Hundred Eleven Dollars ($52,211.00) from the sale of the equipment. Debtor disputes having knowledge of this action.

## III. THE PARTIES' POSITIONS

Relying on Section 365(d)(10) of the Bankruptcy Code, Lessors claim that they are due, as administrative expenses, post-petition rent payments from the petition date until the date the GE/PM and VE/PM Leases were rejected. Lessors further claim, pursuant to Section 365(g)(1) of the Bankruptcy Code, that they have a general unsecured claim for all rental payments through the termination date of the GE/PM and VE/PM Leases, less amounts actually received, because their attempt to mitigate damages by re-letting to Snyder was unsuccessful.

Debtor objected to the administrative rent claim on the basis that: (1) pursuant to Section 365(d)(10) of the Bankruptcy Code, the Lessors—rather than the Debtor—benefited from the use of the equipment subsequent to the entry of the Sale Order and, therefore, since there was no benefit to the bankruptcy estate, Lessors are not entitled to an administrative rent claim for that period, and (2) the actions of Lessors amounted to a reclamation of the leased equipment as of July 18, 2002. Debtor objected to the post-rejection damages on the basis that the Snyder Leases fully mitigated the Lessors' damages and Lessors are estopped from seeking damages under the GE/PM and VE/PM Leases because they filed proofs of claim for these same damages in the Snyder bankruptcy proceedings.

## IV. DISCUSSION

There are two elements to Lessors' claims. The first is the amount of damages that should be allowed as a result of the rejection of the GE/PM Lease and the VE/PM Lease. The second element is the amount of administrative expense claim to which Lessors are entitled prior to rejection of the Leases.

---

**5.** On December 19, 2005, when this Memorandum Opinion was nearly complete, Lessors filed an Amended Motion for Summary Judgment, which sets forth the distribution amounts they received in the Snyder bankruptcy. As a consequence, Lessors now assert that their claims should be reduced by (i) the distribution amount of One Hundred Ninety–Three Thousand Forty–Eight and 13/100 Dollars ($193,048.13) for Giant Eagle (Claim No.1922), and (ii) the distribution amount of Nine Thousand Six Hundred Ninety–Three and 65/100 Dollars ($9,693.65) for Valu Eagle (Claim No.1924). However, because of the conclusions of law reached by this Court, the additional facts in the Amended Motion for Summary Judgment did not affect the allowance of Claim Nos.1922 and 1924.

## A. Post–Rejection Lease Damages

As set forth above, Debtor rejected the GE/PM and VE/PM Leases pursuant to Court Order dated September 30, 2002. Effective October 31, 2002, Lessors entered into new leases with Snyder for the same equipment at the same rental rates, but for a longer lease term. Lessors claim damages from the rejection of the GE/PM and VE/PM Leases from the date of rejection through September 30, 2008, less the amount of rent Lessors received from Snyder. Debtor objected to these elements of Lessors' claims on the basis that, by entering into the Snyder Leases, Lessors fully mitigated their damages and are not entitled to any further claim as a result of rejection of the GE/PM and VE/PM Leases. Debtor further objected on the basis that, since Lessors filed proofs of claim for these same damages in the Snyder's bankruptcy, they are judicially estopped from seeking damages for this same period in the Debtor's bankruptcy case.

Lessors claim that their attempt at mitigation was unsuccessful and that, since the Snyder Leases did not constitute a novation, Debtor is still obligated for damages through the end of the lease term less any amounts Lessors actually received.

The Bankruptcy Code provides the trustee or debtor-in-possession, subject to Court approval, the authority to assume or reject executory contracts or unexpired leases of the debtor. 11 U.S.C. § 365(a). Rejection of a lease can occur anytime before confirmation of a plan. 11 U.S.C. § 365(d). When a debtor rejects a lease or executory contract under these sections, the effect is as if the debtor had breached the lease or contract immediately prior to the petition date. 11 U.S.C. § 365(g).

 The Bankruptcy Code does not address how to calculate a lessor's damages after rejection of an unexpired lease; consequently, the Court must look to state law to determine how to calculate breach of contract damages. *Unsecured Creditors' Committee of Highland Superstores, Inc. v. Strobeck Real Estate, Inc. (In re Highland Superstores, Inc.)*, 154 F.3d 573, 579 (6th Cir.1998). State law should be applied in bankruptcy proceedings only to the extent that it does not conflict with the Bankruptcy Code. *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). This is because Congress has decided to leave "the determination of property rights in the assets of the bankruptcy estate to state law." *Butner*, 440 U.S. at 59, 99 S.Ct. 914.

 The GE/PM and VE/PM Leases each contain a choice of law section that provides that they will be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania. (GE/PM Lease, ¶ 19(c); VE/PM Lease, ¶ 19(d).) Accordingly, the Court will look to Pennsylvania law to determine the amount of damages to which Lessors are entitled as a result of Debtor's breach of the leases. The parties agree that Pennsylvania law applies to determine the amount of damages, but also concede that Pennsylvania and Ohio law on this issue are virtually identical. (See Brief in Support of Lessors' Motion for Summary Judgment at 4; Debtor's Motion for Summary Judgment at 6.) Pennsylvania and Ohio have each adopted Uniform Commercial Code Article 2A. Pennsylvania Statutes Chapter 12, Section 2A523 (Ohio Rev. Code § 1310.69) provides, in pertinent part:

> (a) If a lessee … fails to make a payment when due or repudiates with respect to a part of the whole, then, with respect to any goods involved … the lessee is in default under the lease contract and the lessor may:
>
> . . . . .

(5) Dispose of the goods and recover damages (section 2A527), or retain the goods and recover damages (section 2A528), or in a proper case recover rent (section 2A529)

. . . .

Section 2A529 provides that, after a default in Section 2A523(a) and where the goods are not repossessed or tendered to the lessor, or where the lessor is unable after reasonable effort to dispose of the goods at a reasonable price, or the circumstances reasonably show the efforts will be unavailing, then the lessor may recover the present value of the remaining lease term. 13 Pa.C.S. § 2A529(a), *et seq.* However if the lessor retains some of the property or re-lets it, the amount received by the lessor must be credited to lessee's default damages. 13 Pa.C.S. § 2A529(c). Furthermore, if a lessor does not fully exercise a right or obtain a remedy under Section 2A523(a), the lessor may recover the loss from lessee's default as determined in a reasonable manner. 13 Pa.C.S. § 2A523(b).

■ Nevertheless, a lessor has the duty to mitigate damages from the breach.[6] *Paskorz v. JMK Realty (In re Paskorz)*, 284 B.R. 429, 431 (Bankr.W.D.Pa.2002) (citing *In re New York City Shoes, Inc.*, 86 B.R. 420 (Bankr.E.D.Pa.1988)). Furthermore, a lessor cannot claim damages that it could have avoided with reasonable effort. *Paskorz*, 284 B.R. at 432; See also RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981).

There is no question that Lessors tried to mitigate the damages under the GE/PM and VE/PM Leases. On October 31, 2002, one (1) month after the rejection, Lessors entered into the Snyder Leases. However, Snyder filed its own bankruptcy case eleven (11) months after entering into the mitigating leases with Lessors. Snyder rejected the Snyder Leases on November 30, 2003—four (4) years and nine (9) months prior to the expiration of the GE/PM and VE/PM Lease terms.

The parties' dispute over the amount of Lessors' rejection damages centers on whether Snyder's failure to fulfill the Snyder Lease obligations revived Debtor's duty under the GE/PM and VE/PM Leases. This Court has not found—and neither party was able to cite to the Court—any case where a lessor successfully revived the duties of an original lease after mitigation "failed." As a practical matter, this Court believes that the lack of such case law stems from the fact that Lessors' argument hangs entirely on timing. If the Court had ruled on the Omnibus Objections soon after the objections were filed and prior to Snyder's rejection of the Snyder Leases, Lessors would not have been able to make the argument that the Debtor is still liable under the GE/PM and VE/PM Leases. Indeed, the Responses of Giant Eagle and Valu Eagle to the Thirteenth and Fourteenth Omnibus Objections did not even address the Debtor's objection to the rejection damages. The Responses dealt only with the objection to the administrative expense claim. Giant Eagle and Valu Eagle acknowledge that Debtor objected to rejection damages "in full on the grounds that the Equipment was re-let to Snyder Drug on October 1, 2002 on the same terms as Phar–Mor paid" (Giant Eagle Response, ¶ 10) and "Debtor's objection is based on the fact that Snyder's Drug re-leased the Equipment at the same rental rate as Debtor after the rejection" (Valu Eagle Response,

---

6. Even if this was not the case under Pennsylvania case law, the GE/PM and VE/PM Leases required Lessors to mitigate damages in the event Debtor defaulted. (GE/PM Lease at ¶ 17; VE/PM Lease at ¶ 18(b)(v).)

¶ 6). However, in the "wherefore" clause of both Responses, Lessors only ask that the objections to the administrative claims be overruled. This is at least a tacit acknowledgement by Giant Eagle and Valu Eagle that entering into the Snyder Leases fully mitigated any damages they could assert against Debtor as a result of rejection of the GE/PM and VE/PM Leases. The amount of damages resulting from the rejection of an executory contract or unexpired lease, pursuant to Section 365 of the Bankruptcy Code, cannot be dependent upon the timing of the Court's grant or denial of an objection to claim.

■ This Court holds that, once a lessor mitigates its damages by re-letting the equipment, the lessor cannot claim damages from the debtor for the period covered by the new lease—even if subsequently the new lessee defaults in its obligations to the lessor. To hold otherwise would require the Court to attempt to forecast the viability of each lessee in a mitigating lease to determine if the mitigation will be "successful."

Lessors fully mitigated their damages under the GE/PM and VE/PM Leases when they re-leased the equipment to Snyder. Lessors made their own business decision to enter into the Snyder Leases on the terms set forth therein. Lessors had the ability to evaluate Snyder as a lessee and require some kind of security or different lease terms to attempt to protect themselves from damages that might result from a possible breach of contract by Snyder. Lessors made their own business decision in leasing to Snyder and must live with this choice. If the Court were to allow the subsequent breach of a mitigating lease to revive a debtor's obligations under the original lease, it would create

great uncertainty as to lessee's future obligations. This is especially evident in the case of commercial leases where the leases run for long periods of time. Under the Lessors' theory, a lessee that breaches a lease that has twenty (20) years remaining on the term would be forced to wait anxiously to see if the original lessee would be obligated for damages in the event that the lessee under the mitigating lease might breach some time during that twenty (20) year period. If the statute of limitations expires prior to the end of the original lease term, in order to protect itself from the possibility that the mitigation lease might "fail," the lessor would have to sue for breach of contract even if there were no actual, but only potential speculative, damages. Such an outcome is not practical and makes no sense.

In the instant case, Lessors fully mitigated their damages by re-leasing the equipment to Snyder. If this Court were to allow Lessors' claims for rejection damages for the period after Lessors entered into the Snyder Leases, the effect would be as if Debtor was a guarantor or co-debtor with Snyder. However, Debtor did not guarantee the Snyder Leases, nor is Debtor a co-debtor of Snyder. Accordingly, Debtor's duties under the original leases were not revived when the mitigation failed.

Lessors assert that Debtor could have terminated its liability under the GE/PM and VE/PM Leases by assuming the Leases and assigning them under § 365(k) of the Bankruptcy Code. By not doing so, Lessors argue that Debtor permitted Lessors' asserted claim for rejection damages against the bankruptcy estate.[7] For the

---

7. The fact that the Debtor could have taken a different course of action does not affect the amount of the damages that Lessors can claim pursuant to the action that the Debtor actually took.

reasons set forth below, this Court disagrees. Section 365(k) reads:

Assignment by the trustee to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

When a contract or lease is assumed, the debtor takes on administrative expense liability. By assigning such assumed contract or lease, the debtor is relieved of that liability in the event of a subsequent breach by the assignee. Under Section 365(k), however, the creditor is protected because, prior to accepting performance from the new contracting party, the creditor must be assured that the new party can perform the contract or lease. In other words, if a debtor assumes a contract/lease and assigns the same contract/lease to another party, then the creditor receives the benefit of the original contract/lease. In substance, under Section 365(k), it is the debtor—not the creditor—that finds a new party to mitigate the damages under the contract/lease.

The circumstances under Section 365(k) differ markedly from the situation in the instant case. Here, the Lessors found a new contracting party—Snyder—to mitigate the damages and entered into *new* leases with Snyder (not an assignment of the GE/PM and/or VE/PM Leases). Lessors made their own business decisions and assured themselves about the ability of Snyder to perform. Lessors fully mitigated their damages by re-letting to Snyder. By entering into the Snyder Leases, Lessors replaced Giant Eagle and Valu Eagle with Snyder as a new obligor for the

equipment during the original lease term.[8] To allow the Lessors to recover from both Snyder and Debtor for the breach of the period covered by the GE/PM and VE/PM Leases would put Lessors in a better position than they were in under the original leases with Debtor.

■ As a result, Debtor is not liable for damages that occurred after the Snyder Leases went into effect.[9] Accordingly, Debtor is only liable to Lessors for one (1) month of rent—for the period between the date of rejection (September 30, 2002) and the date the Snyder Leases went into effect (October 30, 2002)—as damages arising from the rejection of the GE/PM and VE/PM Leases. Consequently, Giant Eagle is allowed a general unsecured claim (Claim No.1922) in the amount of Forty–Four Thousand Four Hundred Ninety–Six and 45/100 Dollars ($44,496.45) and Valu Eagle is allowed a general unsecured claim (Claim No.1924) in the amount of One Thousand Eight Hundred Thirty–Two and 46/100 Dollars ($1,832.46). The remainder of these claims relating to rejection of the GE/PM and VE/PM Leases are disallowed.

### B. Pre–Rejection Administrative Rent Claims

Although the Sale Order occurred on July 18, 2002, which resulted in rejection of the real estate lease for the Tamco warehouse where the equipment was located, the GE/PM and VE/PM Leases were not rejected until September 30, 2002. Lessors claim two (2) components to their claim for administrative rent. The first covers the period from the petition date through the date of the Sale Order. The

---

8. The Snyder Leases had a longer lease term than the GE/PM and VE/PM Leases.

9. Since Debtor is not liable for damages for the period covered by the proofs of claim

Lessors submitted in the Snyder bankruptcy, the Court does not have to address the judicial estoppel argument.

second covers the period from the Sale Order until the Leases were rejected.

Both parties rely on Section 365(d)(10) of the Bankruptcy Code, which provides:

> The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property ... until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court after notice and a hearing based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof.

11 U.S.C. § 365(d)(10). As noted, Section 503(b)(1), which sets forth and restricts what may be claimed as an administrative expense, is not incorporated into Section 365(d)(10). Section 503(b)(1) specifically provides, among other things, that an allowed administrative expense must be "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1).

### 1. The period September 24, 2001 through July 17, 2002

Debtor does not contest that Lessors are entitled to an administrative rent claim for the period September 24, 2001 through July 17, 2002. Debtor admits to using Lessors' equipment during this period and further admits that the Leases were not rejected until September 30, 2002. (Stipulations at ¶¶ 7; 13.) Since Debtor's obligations under the GE/PM and VE/PM Leases arose prior to the petition date and the Leases were not rejected until September 30, 2002, Lessors are entitled to an administrative rent claim for the period September 24, 2001 through July 17, 2002 pursuant to Section 365(d)(10). As a consequence, Giant Eagle is due for this peri-od, after credit for amounts Debtor paid post-petition, Ninety–Six Thousand Three Hundred Seventy–Five and 72/100 Dollars ($96,375.72). Valu Eagle is due for this period, after credit for amounts Debtor paid post-petition, Four Thousand Five Hundred Ninety–Seven and 59/100 Dollars ($4,597.59).

### 2. The Period July 18, 2002 through September 30, 2002

■ Debtor objects to Lessors' claim for administrative rent for the period July 18, 2002 through September 30, 2002 on the basis that it would be inequitable to allow this claim under Section 365(d)(10) and, furthermore, Lessors reclaimed the personal property as of the date the warehouse lease was rejected. This Court disagrees.

Debtor argues that, because the real property lease was rejected on July 18, 2002, it did not receive any benefit from the equipment after that date. Debtor argues that it did not have any right to the equipment after the warehouse lease was rejected because possession of the warehouse was turned over immediately to Lessors and the equipment was located at the warehouse. As a consequence, Debtor argues that the Lessors reclaimed the equipment effective July 18, 2002. Each of the parties makes an argument that, in order to conduct the inventory required by the Sale Order, the equipment covered by the GE/PM and VE/PM Leases had to be used. Each party further maintains that the other party benefited from such use. Although most of the inventory in the warehouse was sold to either Giant Eagle or CVS, Debtor had and stored inventory in the Tamco warehouse for a period after the rejection date. (Affidavit of Carmen Forde at ¶ 3.) The parties assert that there are questions of fact regarding the extent that the equipment was used to take inventory and who owned and/or bought the

inventoried property. (Stipulations at ¶ 12.)

Lessors argue that the Court cannot review whether the Debtor received any benefit under the lease after the lease rejection date. This Court disagrees and concurs with the Debtor that, in the usual case, such analysis necessarily must occur after the rejection. Such a factual analysis that would be difficult, if not impossible, to ascertain prior to rejection. The Court's ability to determine whether Debtor received any benefit from the equipment subsequent to the Sale Order and prior to September 30, 2002, does not end the inquiry concerning the amount of the administrative claim. As noted above, Section 365(d)(10) specifically states that it is to be considered "notwithstanding section 503(b)(1)."

It appears that both Lessors and Debtor benefited from the inventory at the Tamco warehouse and, despite the question of fact regarding how much the equipment was used in this process, it is not disputed that the equipment was used to some extent. The Hilco/Ozer Group liquidation agreement guaranteed Debtor a minimum of One Hundred Four Million Eight Hundred Twenty–Five Thousand Dollars ($104,825,-000.00). (Stipulations at Exh. A, sec. 4.1). Debtor was also to receive Seventy–Five Cents ($.75) for each dollar that the final inventory value exceeded Seventeen Million Four Hundred Thousand Dollars ($17,400,000.00).[10] Debtor admits that the

equipment was used to remove the inventory from the warehouse and manage the warehouse's contents.[11] (Affidavit of Carmen Forde at ¶ 3.) Consequently, it appears that Debtor benefited from the used of the equipment subsequent to July 18, 2002.

Debtor argues that Giant Eagle benefited from the use of the equipment because Giant Eagle purchased Seventeen Million Four Hundred Thousand Dollars ($17,400,-000.00) worth of inventory at a discount of Four Million Two Hundred Thirteen Thousand Dollars ($4,213,000.00).[12] As a consequence, Giant Eagle benefited from the inventory and the use of the equipment in conducting the inventory.

Notwithstanding the fact that Debtor benefited from use of the equipment covered by the Leases after the Sale Order, there is a more compelling reason to permit Lessors to claim administrative expense claims through the rejection date of September 30, 2002.[13] Debtor chose not to reject the GE/PM and VE/PM Leases until September 30, 2002. Debtor exercised its business judgment in choosing not to reject the GE/PM and VE/PM Leases at the same time it rejected the lease for the warehouse on July 18, 2002. The Court authorized this exercise of Debtor's business judgment when it approved the rejection of the Leases pursuant to Debtor's motion. Debtor cannot now claim that it is inequitable to pay Lessors an administra-

10. The value of the inventory was approximately Twenty–Six Million Dollars ($26,-000.000.00). (Affidavit of Carmen Forde at ¶ 4.)

11. Section 7.1(a) of the Agency Agreement required the liquidators to pay fifty percent (50%) of the "fees and costs" of taking the inventory but Section 7.1(1) excluded amounts due under personal leases in the definition of "fees and costs" of taking inventory.

12. Without Giant Eagle's participation in the liquidation, the liquidators might not have submitted the same maximum bid. As a consequence, it appears that Debtor benefited from Giant Eagle's participation in the liquidation.

13. Debtor did not file the Motion to Reject Personal Property Leases until September 20, 2005.

tive claim for rent under the GE/PM and VE/PM Lease until the date of rejection when it strategically chose the rejection date.

The equities of this case do not permit Debtor to escape its duty to pay Lessors for administrative rent from July 18, 2002 until the lease rejection date of September 30, 2002. Debtor admits its agent (the Hilco/Ozer Group) used the equipment during this time period to conduct the inventory and move the property. Lessors could not have "reclaimed" the equipment after the date of the Sale Order because Debtor's agent continued to use the equipment during this period. Debtor chose not to reject the GE/PM and VE/PM Leases until September 30, 2002. Since Debtor's personal property lease obligations to Lessors arose pre-petition and the Leases were not rejected until September 30, 2002, Lessors are due the administrative rent claim for the period July 18, 2002 through September 30, 2002 as required by Section 365(d)(10). These administrative expense claims for the period July 18, 2002 through September 30, 2002 are: One Hundred Nine Thousand Eighty–Eight and 70/100 Dollars ($109,088.70) for Giant Eagle and Four Thousand Four Hundred Ninety–Two and 48/100 Dollars ($4,492.48) for Valu Eagle.

## V. CONCLUSION

Based upon the foregoing, the claims of Giant Eagle and Valu Eagle are allowed as follows:

| | |
|---|---|
| Claim No. 1922 (rejection of GE/PM Lease) | $ 44,496.45 |
| Claim No. 1924 (rejection of VE/PM Lease) | $ 1,832.46 |
| Claim No. 88880026 (administrative claim GE/PM Lease) | $205,464.42 |
| Claim No. 88880009 (administrative claim VE/PM Lease) | $ 9,090.07 |